UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CIVIL ACTION NO.
------------------------------------------------------------------------x
DANIELA SCIVETTI,

                                  Plaintiff,

                -against-                                     **COMPLAINT**
                                                      **JURY TRIAL COMPLAINT**
COMPASS, INC., SLATER CONSULTING CORP.,
TROVE PARTNERS, INC., JULIAN BERKELEY,
IAN SLATER, MICHAEL KOENEKE,
and BRETT WALSDORF

                                Defendants.
------------------------------------------------------------------------x

## PRELIMINARY STATEMENT

1.      This is an employment discrimination and retaliation action with related wage, compensation and employee benefits violations, in which plaintiff DANIELA SCIVETTI (hereinafter "Scivetti" or "Plaintiff") seeks relief for defendants' violations of her rights including such rights as secured by Title VII of the Civil Rights Acts of 1964.

2.      Scivetti also asserts pendent causes of action under the laws of the State and City of New York.

3.      Scivetti seeks a jury trial, from which both compensatory and punitive damages are sought, in addition to an award of costs and attorneys fees, and such other and further relief as this Honorable Court deems just and equitable.

## JURISDICTION

4.      Jurisdiction is conferred upon this Court by 28 U.S.C. Sections 1331 and 1343 (3) and (4), in conjunction with Title VII of the Civil Rights Act of 1964, as this is an action seeking redress for violations of plaintiff's civil rights.

5.      Jurisdiction is also invoked pursuant to and under 28 U.S.C. Section 1367, known as Supplemental Pendant Party Jurisdiction, the State and City of New York law claims against any pendant party having a common nucleus of operative facts with the federally based causes of action asserted herein and arising out of the same transaction and occurrence giving rise to the federally based claims and causes of action asserted herein.

6.      Scivetti requests that the Court exercise its appropriate discretion and powers to consider all pendant party and pendent state law claims. The claims derive

from the same transactions and occurrences involving all the parties hereto, giving rise to the federally and State of New York-based claims and causes of action, and have a common nucleus of operative facts with both the federally and State of New York-based claims and causes of action.

## VENUE

7.      Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. Section 1391 (a), (b) and (c).

## PARTIES

8.  That at all times hereinafter alleged, the plaintiff resides in the County of New York, in the State of New York.

9.  That at all times hereinafter alleged, COMPASS, INC. (hereinafter "Compass") was and still is a domestic corporation, duly organized and existing under and by virtue of the laws of the State of New York, maintains its principal place of business and transacts business within the County of New York, and as such, is subject to the jurisdiction of this Honorable Court.

10. That at all times hereinafter alleged, Compass was and still is a foreign corporation, duly registered and authorized to transact business within the State of New York, maintained and maintains its principal place of business, transacted and transacts business, within the County of New York, and as such, is subject to the jurisdiction of this Honorable Court.

11. That at all times hereinafter alleged, Compass was and still is an unincorporated association which transacts business within the State of New York, maintained and maintains its principal place of business, transacted and transacts business, within the County of New York, and as such, is subject to the jurisdiction of this Honorable Court.

12. That at all times hereinafter alleged, SLATER CONSULTING CORP ("The Slater Team") was and still is a domestic corporation, duly organized and existing under and by virtue of the laws of the State of New York, maintains its principal place of business and transacts business within the County of New York, and as such, is subject to the jurisdiction of this Honorable Court.

13. That at all times hereinafter alleged, The Slater Team was and still is a foreign corporation, duly registered and authorized to transact business within the State of New York, maintained and maintains its principal place of business, transacted and transacts business, within the County of New York, and as such, is subject to the jurisdiction of this Honorable Court.

14. That at all times hereinafter alleged, The Slater Team was and still is an unincorporated association which transacts business within the State of New

York, maintained and maintains its principal place of business, transacted and transacts business, within the County of New York, and as such, is subject to the jurisdiction of this Honorable Court.

15. That at all times hereinafter alleged, TROVE PARTNERS, INC. ("Trove") was and still is a domestic corporation, duly organized and existing under and by virtue of the laws of the State of New York, maintains its principal place of business and transacts business within the County of New York, and as such, is subject to the jurisdiction of this Honorable Court.

16. That at all times hereinafter alleged, Trove was and still is a foreign corporation, duly registered and authorized to transact business within the State of New York, maintained and maintains its principal place of business, transacted and transacts business, within the County of New York, and as such, is subject to the jurisdiction of this Honorable Court.

17. That at all times hereinafter alleged, Trove was and still is an unincorporated association which transacts business within the State of New York, maintained and maintains its principal place of business, transacted and transacts business, within the County of New York, and as such, is subject to the jurisdiction of this Honorable Court.

18. That at all times hereinafter alleged, JULIAN BERKELEY ("Berkeley") was and is a resident of the County of New York, in the State of New York, and as such, Berkeley is subject to the jurisdiction of this Honorable Court.

19. That at all times hereinafter alleged, IAN SLATER (Slater") was and is a resident of the County of New York, in the State of New York, and as such, Slater is subject to the jurisdiction of this Honorable Court.

20. That at all times hereinafter alleged, MICHAEL KOENEKE ("Koeneke") was and is a resident of the County of New York, in the State of New York, and as such, Koeneke is subject to the jurisdiction of this Honorable Court.

21. That at all times hereinafter alleged, BRETT WALSDORF ("Walsdorf"- all defendants collectively referred to as "Defendants", and Berkeley, Slater, Koeneke, and Walsdorf collectively referred to as "Individual Tortfeasors", and Compass and The Slater Team collectively referred to herein as the "Employer") was and is a resident of the County of New York, in the State of New York, and as such, Walsdorf is subject to the jurisdiction of this Honorable Court.

## STATEMENT OF FACTS APPLICABLE TO ALL CAUSES OF ACTION

22. That at all times hereinafter alleged, Compass was and is in the business of providing real estate services, including but not limited to, aiding its clients ("Compass Clients") in the renting, selling and buying of real property, within

various Counties of the City and State of New York (hereinafter "Compass' Real Estate Business").

23. That at all times hereinafter alleged, Compass hired/retained, and continues to hire/retain, individuals to assist in, transact and effectuate, Compass' Real Estate Business.

24. That at all times hereinafter alleged, Compass hired/retained, and continues to hire and retain, individuals to assist in, transact and effectuate, Compass' Real Estate Business, for positions which included, but are not limited to, in-house administrative operations, duties and responsibilities (hereinafter "Administrative Staff"), and for positions which needed licensure from the State of New York, including real estate agents ("Agents") and real estate brokers ("Brokers"- the Administrative Staff, Agents and Brokers are collectively referred to as the "Compass Personnel").

25. That at all times hereinafter alleged, Compass issued, promulgated, enacted, supervised and enforced, and continues to promulgate, enact, supervise and enforce, rules, regulations, manuals, employee handbooks, training, standards, by-laws, policies and procedures, custom and practices, which governed and continues to govern, the requirements, duties and responsibilities for the assisting, aiding, transacting and effectuating of Compass' Real Estate Business by the Compass Personnel, and with regards to the terms and conditions, rights and privileges, and terms and conditions, with regards to working at Compass (hereinafter "Compass' Policies And Procedures").

26. That at all times hereinafter alleged, Compass classified and continues to classify the Compass Personnel, for compensation and tax reporting purposes, as follows: Administrative Staff- employees; Brokers- Independent Contractors; Agents-Independent Contractors.

27. That at all times hereinafter alleged, notwithstanding Compass' classification of the Compass Personnel, Compass required and continues to require strict compliance with the Compass Policies And Procedures as a condition precedent to the hiring/retention, and continued retention, of the Compass Personnel, as well as subjected and continues to subject the Compass Personnel the same supervision, direction and control over the terms and conditions of their work relationship with Compass.

28. That at all times hereinafter alleged, notwithstanding Compass' classification of the Compass Personnel, Compass exercised and exercises the same supervision, direction and control over all terms and conditions of the duties and responsibilities of the Compass Personnel, including but not limited to, how the Compass Personnel were and are to perform their job duties and responsibilities, including as is alleged in this Complaint, as well as the results thereof.

29. That at all times hereinafter alleged, the Compass Policies And Procedures authorized, allowed, permitted and/or ratified, and continues to authorize, allow, permit and ratify, its Brokers, to assist and aid the Compass Clients in the conducting and transacting of the Compass Real Estate Business, to form and organize their own divisions/departments within Compass (hereinafter the "Compass Departments").

30. That at all times hereinafter alleged, the Compass Policies And Procedures authorized, allowed, permitted and/or ratified, and continues to authorize, allow, permit and ratify, its Brokers to form and organize Compass Departments, either in their individual capacities, or as a business entity recognized under New York law, such as a corporation, to conduct and transact the Compass Real Estate Business.

31. That at all times hereinafter alleged, Compass charged and charges fees to its clients, as compensation for services rendered on each closed Compass' Real Estate Business transaction, with the fee generally calculated and agreed-to between Compass and the Compass clients of the rental or purchase price of the transaction (hereinafter "Compass' Fees").

32. That at all times hereinafter alleged, Compass paid and continues to pay a fee to its agents, brokers and its Compass Departments, as compensation for this and/or its services for their and/or its participation in the closing Compass Real Estate Business transactions, which is generally calculated and agreed-to between Compass and the individual agent, broker and/or Compass Departments (hereinafter the "Commissions").

33. That at all times hereinafter alleged, Compass appointed, assigned and/or delegated to, and continues to appoint, assign and/or delegate to, a Compass agent, servant and employee, to coordinate, authorize, approve, oversee, supervise, direct and control, the formation, organization and operation of the Compass Departments, including the compliance with the Compass Policies And Procedures, as well as with regards to the hiring, retention, terms and conditions, duties and responsibilities, and firing/termination, of the Compass Personnel assigned to and/or hired by any of the Compass Departments (hereinafter the "Compass Liaison").

34. That at all times hereinafter alleged, the conducting of the Compass Real Estate Business by the Compass Departments, including all personnel decisions regarding the Compass Personnel assigned and/or hired thereto, were and are subject to the approval, supervision, direction and control, of Compass, including but not limited to, by the Compass Liaison.

35. That at all times hereinafter alleged, regardless of the form of, or how formed/organized, the Compass Departments were and are not only required to comply with the Compass Polices And Procedures, but were subjected and remain

subject to Compass' supervision, direction, control and approval in its conducting and transacting of Compass' Real Estate Business.

36. That at all times hereinafter alleged, regardless of the form of, or how formed/organized, Compass, authorized, permitted, allowed and/or ratified, and continues to authorize, permit, allow and/or ratify, the Compass Departments to retain/hire Compass Personnel (that is, Administrative Staff, Brokers and/or Agents) for assignment to specific Compass Departments (the "Compass Departments Personnel").

37. That at all times hereinafter alleged, the Compass Departments classified and continues to classify the Compass Departments Personnel, for compensation and tax purposes, the same as did/does Compass.

38. That at all times hereinafter alleged, the Compass Departments required and require the advice, consent and approval of Compass (including but not limited to, through the Compass Liaison) with regards to:

    i.   The hiring/assignment to any of the Compass Departments Personnel;
    ii.   Terms and conditions of the hiring/retention and the continued retention, of the Compass Departments Personnel;
    iii.   The implementation of, and compliance with, the Compass Policies And Procedures;
    iv.   The supervision, direction and control over the duties and responsibilities of the Compass Departments Personnel; and
    v.   The conducting and transacting of Compass' Real Estate Business on behalf of the Compass clients.

39. That at all times hereinafter alleged, regardless of Compass Departments to which any of the Compass Departments Personnel was assigned, all Compass Departments Personnel were subject to compliance with the Compass Policies And Procedures, and their duties and responsibilities, including their continued employment/working relationship at the Compass Departments were subject to the supervision, direction and control of Compass, including by the Compass Liaison.

40. That at all times hereinafter alleged, and regardless of how classified, the terms and conditions of each of Compass Departments Personnel were and are jointly supervised, directed and controlled by both Compass and by the particular Compass Department to which the Compass Departments Personnel were assigned.

41. That at all times hereinafter alleged, and regardless of how classified, the Compass Departments Personnel were and are joint, general and/or special employees of both Compass and the Compass Departments to which the Compass Departments Personnel were assigned.

42. That at all times hereinafter alleged, The Slater Team was and is one of the Compass Departments, subjected and subject to the Compass Policies And Procedures, as well as subjected and subject to oversight, approval, authorization, supervision, direction and control by Compass, including by a Compass Liaison, regarding both the conducting and transacting of the Compass Real Estate Business for the Compass clients, and the hiring, retention, firing, supervision, direction and control over the terms and conditions, and the duties and responsibilities, of any Compass Departments Personnel assigned thereto.

43. That at all times hereinafter alleged, The Slater Team conducted any and all business operations as one of the Compass Departments, solely for the conducting and transacting of the Compass Real Estate Business, in accordance with the Compass Policies And Procedures, as well as subject to the oversight, approval, supervision, direction and control, of Compass, including but not limited to, the Compass Liaison.

44. That at all times hereinafter alleged, Compass assigned to The Slater Team, Compass Departments Personnel (that is, Administrative Staff, Brokers and Agents), solely for the conducting and transacting of Compass Real Estate Business.

45. That at all times hereinafter alleged, The Slater Team hired and/or retained, Compass Departments Personnel (that is, Administrative Staff, Brokers and Agents), solely for the conducting and transacting of Compass Real Estate Business.

46. That at all times hereinafter alleged, any and all Compass Departments Personnel assigned and/or hired to and thereafter retained by The Slater Team was in accordance with the Compass Policies And Procedures, and the terms and conditions, duties and responsibilities of the positions of the Compass Departments Personnel were subject to the oversight, approval, supervision, direction and control, of Compass, including but not limited to, the Compass Liaison.

47. That at all times hereinafter alleged, The Slater Team classified (including but not limited to, for compensation and tax reporting purposes) the Compass Departments Personnel assigned thereto by Compass, and/or hired and/or retained by The Slater Team, the same as did Compass.

48. That at all times hereinafter alleged, notwithstanding The Slater Team's classification of its Compass Departments Personnel, The Slater Team exercised the same supervision, direction and control over all terms and conditions of the duties and responsibilities of the Compass Departments Personnel assigned and/or hired thereto, including but not limited to, how the Compass Departments Personnel assigned and/or hired thereto were to perform their job duties and

responsibilities, including as alleged in this Complaint, as well as the results thereof.

49. That at all times hereinafter alleged, and regardless of how classified for compensation or tax purposes, the terms and conditions of each of Compass Departments Personnel assigned by Compass to, and/or hired by, The Slater Team, were jointly supervised, directed and controlled, by both Compass and The Slater Team.

50. That at all times hereinafter alleged, and regardless of how classified, the Compass Departments Personnel assigned by Compass to, and/or hired by, The Slater Team, were and are joint, general and/or special employees of both Compass and The Slater Team.

51. That at all times hereinafter alleged, Trove was and is one of the Compass Departments, subjected and subject to the Compass Policies And Procedures, as well as subjected and subject to oversight, approval, authorization, supervision, direction and control by Compass, including by a Compass Liaison, regarding both the conducting and transacting of the Compass Real Estate Business for the Compass clients, and the hiring, retention, firing, supervision, direction and control over the terms and conditions, and the duties and responsibilities, of any Compass Departments Personnel assigned thereto.

52. That at all times hereinafter alleged, Trove conducted any and all business operations as one of the Compass Departments, solely for the conducting and transacting of the Compass Real Estate Business, in accordance with the Compass Policies And Procedures, as well as subject to the oversight, approval, supervision, direction and control, of Compass, including but not limited to, the Compass Liaison.

53. That at all times hereinafter alleged, Compass assigned to Trove, Compass Departments Personnel (that is, Administrative Staff, Brokers and Agents), solely for the conducting and transacting of Compass Real Estate Business.

54. That at all times hereinafter alleged, Trove hired and/or retained, Compass Departments Personnel (that is, Administrative Staff, Brokers and Agents), solely for the conducting and transacting of Compass Real Estate Business.

55. That at all times hereinafter alleged, any and all Compass Departments Personnel assigned and/or hired to and thereafter retained by Trove was in accordance with the Compass Policies And Procedures, and the terms and conditions, duties and responsibilities of the positions of the Compass Departments Personnel were subject to the oversight, approval, supervision, direction and control, of Compass, including but not limited to, the Compass Liaison.

56. That at all times hereinafter alleged, Trove classified (including but not limited to, for compensation and tax reporting purposes) the Compass Departments Personnel assigned thereto by Compass, and/or hired and/or retained by Trove, the same as did Compass.

57. That at all times hereinafter alleged, notwithstanding Trove's classification of its Compass Departments Personnel, Trove exercised the same supervision, direction and control over all terms and conditions of the duties and responsibilities of the Compass Departments Personnel assigned and/or hired thereto, including but not limited to, how the Compass Departments Personnel assigned and/or hired thereto were to perform their job duties and responsibilities, including as alleged in this Complaint, as well as the results thereof.

58. That at all times hereinafter alleged, and regardless of how classified for compensation or tax purposes, the terms and conditions of each of Compass Departments Personnel assigned by Compass to, and/or hired by Trove, were jointly supervised, directed and controlled, by both Compass and Trove.

59. That at all times hereinafter alleged, and regardless of how classified, the Compass Departments Personnel assigned by Compass to, and/or hired by Trove were and are joint, general and/or special employees of both Compass and Trove.

60. That at all times hereinafter alleged, Scivetti was an employee of Compass.

61. That at all times hereinafter alleged, Scivetti was an employee of The Slater Team.

62. That at all times hereinafter alleged, Scivetti was an independent contractor for Compass.

63. That at all times hereinafter alleged, Scivetti was an independent contractor for The Slater Team.

64. That at all times alleged herein, Scivetti was and is a real estate agent licensed by the State of New York.

65. That at all times hereinafter alleged, Berkeley was and is an officer, director and/or shareholder of Compass.

66. That at all times hereinafter alleged, Berkeley was and is an employee of Compass.

67. That at all times hereinafter alleged, Berkeley was an independent contractor of Compass.

68. That at all times alleged herein, Berkeley was and is a real estate agent licensed by the State of New York.

69. That at all times alleged herein, Berkeley was and is a real estate broker licensed by the State of New York.

70. That at all times hereinafter alleged, Berkeley was and is a Compass Liaison.

71. That at all times hereinafter alleged, Berkeley was a Compass Liaison for The Slater Team.

72. That at all times hereinafter alleged, Berkeley was and is a Compass Liaison for Trove.

73. That at all times hereinafter alleged, Slater was and is an officer, director, and/or shareholder, of Compass.

74. That at all times hereinafter alleged, Slater was and is an employee of Compass.

75. That at all times hereinafter alleged, Slater was an independent contractor of Compass.

76. That at all times alleged herein, Slater was and is a real estate agent licensed by the State of New York.

77. That at all times alleged herein, Slater was and is a real estate broker licensed by the State of New York.

78. That at all times hereinafter alleged, Koeneke was an officer, director, and/or shareholder of Compass.

79. That at all times hereinafter alleged, Koeneke was an employee of Compass.

80. That at all times hereinafter alleged, Koeneke was an independent contractor of Compass.

81. That at all times alleged herein, Koeneke was and is a real estate agent licensed by the State of New York.

82. That at all times alleged herein, Koeneke was and is a real estate broker licensed by the State of New York.

83. That at all times hereinafter alleged, Walsdorf was an officer, director, and/or shareholder of Compass.

84. That at all times hereinafter alleged, Walsdorf was an employee of Compass.

85. That at all times hereinafter alleged, Walsdorf was an independent contractor of Compass.

86. That at all times alleged herein, Walsdorf was and is a real estate agent licensed by the State of New York.

87. That at all times alleged herein, Walsdorf was and is a real estate broker licensed by the State of New York.

88. That at all times hereinafter alleged, Berkeley was and is an officer, director, and/or shareholder of The Slater Team.

89. That at all times hereinafter alleged, Berkeley was and is an employee of The Slater Team.

90. That at all times hereinafter alleged, Berkeley was and is an independent contractor of The Slater Team.

91. That at all times hereinafter alleged, Slater was and is an officer, director, and/or shareholder of The Slater Team.

92. That at all times hereinafter alleged, Slater was and is an employee of The Slater Team.

93. That at all times hereinafter alleged, Slater was and is an independent contractor of The Slater Team.

94. That at all times hereinafter alleged, Koeneke was and is officer, director, and/or shareholder of The Slater Team.

95. That at all times hereinafter alleged, Koeneke was and is an employee of The Slater Team.

96. That at all times hereinafter alleged, Koeneke was and is an independent contractor of The Slater Team.

97. That at all times hereinafter alleged, Walsdorf was and is an officer, director and/or shareholder of The Slater Team.

98. That at all times hereinafter alleged Walsdorf was and is an employee of The Slater Team.

99. That at all times hereinafter alleged, Walsdorf was and is an independent contractor of The Slater Team.

100.    That at all times hereinafter alleged, Berkeley was and is an officer, director, and/or shareholder of Trove.

101.    That at all times hereinafter alleged, Berkeley was and is an employee of Trove.

102.    That at all times hereinafter alleged, Berkeley was and is an independent contractor of Trove.

103.    That at all times hereinafter alleged, Slater was and is an officer, director, and/or shareholder of Trove.

104.    That at all times hereinafter alleged, Slater was and is an employee of Trove.

105.    That at all times hereinafter alleged, Slater was and is an independent contractor of Trove.

106.    That at all times hereinafter alleged, Koeneke was and is an officer, director and/or shareholder of Trove.

107.    That at all times hereinafter alleged, Koeneke was and is an employee of Trove.

108.    That at all times hereinafter alleged, Koeneke was and is an independent contractor of Trove.

109.    That at all times hereinafter alleged, Walsdorf was and is an officer, director and/or shareholder of Trove.

110.    That at all times hereinafter alleged, Walsdorf was and is an employee of Trove.

111.    That at all times hereinafter alleged, Walsdorf was and is an independent contractor of Trove.

112.    That at all times hereinafter alleged, Berkeley was Scivetti's supervisor, and as such, Berkeley directed and controlled the terms and conditions of Scivetti's employment/tenure at Compass.

113.    That at all times hereinafter alleged, Slater was Scivetti's supervisor, and as such, Slater directed and controlled the terms and conditions of Scivetti's employment/tenure at Compass.

114.    That at all times hereinafter alleged, Koeneke was Scivetti's supervisor, and as such, Koeneke directed and controlled the terms and conditions of Scivetti's employment/tenure at Compass.

115.    That at all times hereinafter alleged, Walsdorf was Scivetti's supervisor, and as such, Walsdorf directed and controlled the terms and conditions of Scivetti's employment/tenure at Compass.

116.    That at all times hereinafter alleged, Berkeley was Scivetti's supervisor, and as such, Berkeley directed and controlled the terms and conditions of Scivetti's employment/tenure at The Slater Team.

117.    That at all times hereinafter alleged, Slater was Scivetti's supervisor, and as such, Slater directed and controlled the terms and conditions of Scivetti's employment/tenure at The Slater Team.

118.    That at all times hereinafter alleged, Koeneke was Scivetti's supervisor, and as such, Koeneke directed and controlled the terms and conditions of Scivetti's employment/tenure at The Slater Team.

119.    That at all times hereinafter alleged, Walsdorf was Scivetti's supervisor, and as such, Walsdorf directed and controlled the terms and conditions of Scivetti's employment/tenure at The Slater Team.

120.    That any and all of the actions, conduct, behavior and occurrences of Berkeley, as is alleged herein, were conducted, actuated and performed with the knowledge, consent, authority and ratification, and within the scope of his duties and responsibilities as an agent, servant and/or employee, of Compass.

121.    That any and all of the actions, conduct, behavior and occurrences of Slater, as is alleged herein, were conducted, actuated and performed with the knowledge, consent, authority and ratification, and within the scope of his duties and responsibilities as an agent, servant and/or employee, of Compass.

122.    That any and all of the actions, conduct, behavior and occurrences of Koeneke, as is alleged herein, were conducted, actuated and performed with the knowledge, consent, authority and ratification, and within the scope of his duties and responsibilities as an agent, servant and/or employee, of Compass.

123.    That any and all of the actions, conduct, behavior and occurrences of Walsdorf, as is alleged herein, were conducted, actuated and performed with the knowledge, consent, authority and ratification, and within the scope of his duties and responsibilities as an agent, servant and/or employee, of Compass.

124.    That any and all of the actions, conduct, behavior and occurrences of Berkeley, as is alleged herein, were conducted, actuated and performed with the

knowledge, consent, authority and ratification, and within the scope of his duties and responsibilities as an agent, servant and/or employee, of The Slater Team.

125.    That any and all of the actions, conduct, behavior and occurrences of Slater, as is alleged herein, were conducted, actuated and performed with the knowledge, consent, authority and ratification, and within the scope of his duties and responsibilities as an agent, servant and/or employee, of The Slater Team.

126.    That any and all of the actions, conduct, behavior and occurrences of Koeneke, as is alleged herein, were conducted, actuated and performed with the knowledge, consent, authority and ratification, and within the scope of his duties and responsibilities as an agent, servant and/or employee, of The Slater Team.

127.    That any and all of the actions, conduct, behavior and occurrences of Walsdorf, as is alleged herein, were conducted, actuated and performed with the knowledge, consent, authority and ratification, and within the scope of his duties and responsibilities as an agent, servant and/or employee, of The Slater Team.

128.    That at all times hereinafter alleged, Compass employed more than fifteen (15) employees, and as such constituted and constitutes an "employer" within the meaning of the Federal anti-discrimination laws pursuant Title VII of the Civil Rights Act of 1964.

129.    That at all times hereinafter alleged, Compass employed more than fifteen (15) independent contractors that should have been classified as employees of Compass.

130.    That at all times hereinafter alleged, Compass employed more than fifteen (15) individuals over which Compass exercised supervision, direction and control over.

131.    That at all times hereinafter alleged, Compass employed more than fifteen (15) individuals, over which Compass, in its exclusive purview:

    i.    Subjected and conditioned employment, and continued employment, of individuals (including but not limited to Compass Personnel and Compass Departments Personnel), to the same Compass Policies And Procedures as were the individuals to which Compass classified as employees;

    ii.    Controlled, directed and otherwise supervised the work schedule of such individuals regardless of the classification of Compass Personnel;

    iii.    Controlled, directed and otherwise supervised where the individuals performed and completed their work, including but

14

not limited to, assigning at Compass' discretion such individuals to work either virtually, at specific Compass offices, or at Compass client locations;

iv.    Controlled, directed and otherwise supervised how the individuals both performed and completed their duties and responsibilities, including but not limited to, directly supervising any and all work performed;

v.    Controlled, directed and otherwise supervised how such individuals would be compensated for work performed, including but not limited to, setting the rate of pay for the individuals and having the unilateral power to change same;

vi.    Controlled, directed and otherwise supervised how individuals would be paid for work completed, including but not limited to, setting the method of pay for the individuals and having the unilateral power to change same;

vii.    Controlled, directed and otherwise supervised which Compass clients such individuals could render Compass' Real Estate Business, and how much such individuals could charge for providing Compass' Real Estate Business;

viii.    Requiring attendance by such individuals at Compass meetings and/or training sessions (whether that be virtually, at Compass' offices, at Compass client locations, or otherwise);

ix.    Reserving the right to review, approve, modify, revise, change and/or amend, any and all Compass' Real Estate Business contracts;

x.    Retaining the right to hire or fire such individuals;

xi.    Preventing such individuals from working for either competitors, or for any other similarly-situated business;

xii.    Permitting such employees to participate in Compass' stock option plan.

132.    That at all times hereinafter alleged, The Slater Team employed more than fifteen (15) employees, and as such constituted and constitutes an "employer" within the meaning of the Federal anti-discrimination laws pursuant Title VII of the Civil Rights Act of 1964.

133.    That at all times hereinafter alleged, The Slater Team employed more than fifteen (15) independent contractors that should have been classified as employees of The Slater Team.

134.    That at all times hereinafter alleged, The Slater Team employed more than fifteen (15) individuals, over which The Slater Team exercised supervision, direction and control.

135.    That at all times hereinafter alleged, The Slater Team employed more than fifteen (15) individuals, over which The Slater Team:

      i.    Controlled, directed and otherwise supervised the work schedule of such individuals;

     ii.    Controlled, directed and otherwise supervised where the individuals performed and completed their work;

   iii.    Controlled, directed and otherwise supervised how the individuals both performed and completed their duties and responsibilities, including but not limited to, directly supervising any and all work performed;

   iv.    Controlled, directed and otherwise supervised how such individuals would be compensated for work performed, including but not limited to, setting the rate of pay for the individuals and having the unilateral power to change same;

     v.    Controlled, directed and otherwise supervised how individuals would be paid for work completed, including but not limited to, setting the method of pay for the individuals;

   vi.    Controlled, directed and otherwise supervised which clients such individuals could provide Compass' Real Estate Business, and how much such individuals could charge for providing Compass' Real Estate Business;

   vii.    Required attendance by such individuals at Compass meetings and/or training sessions (whether that be virtually, at Compass' offices, client locations, or otherwise);

  viii.    Reserved the right to review, approve, modify, revise, change and/or amend, any and all Compass' Real Estate Business contracts;

   ix.    Retained the right to hire or fire such individuals;

    x.     Prevented such individuals from working for either competitors, or for any other similarly-situated business;

    xi.    Permitted such individuals to participate in The Slater Team's health insurance benefits.

136.    That at all times hereinafter alleged, Scivetti was an "employee", as that term is defined by the Federal anti-discrimination laws pursuant Title VII of the Civil Rights Act of 1964.

137.    That at all times hereinafter alleged, Compass is an "employer", as that term is defined the relevant provisions of the Administrative Code of the City of New York, §8-107, et seq. (hereinafter "Administrative Code").

138.    That at all times hereinafter alleged, The Slater Team is an "employer", as that term is defined the relevant provisions of the Administrative Code.

139.    That at all times hereinafter alleged, Scivetti was an "employee", as that term is defined by the Administrative Code.

140.    That at all times hereinafter alleged, Berkeley was a "supervisor", as that term is defined by the Administrative Code.

141.    That at all times hereinafter alleged, Slater was a "supervisor", as that term is defined by the Administrative Code.

142.    That at all times hereinafter alleged, Koeneke was a "supervisor", as that term is defined by the Administrative Code.

143.    That at all times hereinafter alleged, Walsdorf was a "supervisor", as that term is defined by the Administrative Code.

144.    That at all times hereinafter alleged, Berkeley was an "aider and abettor", as that term is defined by the Administrative Code.

145.    That at all times hereinafter alleged, Slater was an "aider and abettor", as that term is defined by the Administrative Code.

146.    That at all times hereinafter alleged, Koeneke was an "aider and abettor", as that term is defined by the Administrative Code.

147.    That at all times hereinafter alleged, Walsdorf was an "aider and abettor", as that term is defined by the Administrative Code.

148.    That at all times alleged, Berkeley was and is an individual subject to liability to Scivetti herein, per the Administrative Code.

149.    That at all times alleged, Slater was and is an individual subject to liability to Scivetti herein, per the Administrative Code.

150.    That at all times alleged, Koeneke was and is an individual subject to liability to Scivetti herein, per the Administrative Code.

151.    That at all times alleged, Walsdorf was and is an individual subject to liability to Scivetti herein, per the Administrative Code.

152.    That at all times hereinafter alleged, Compass and The Slater Team were joint employers of Scivetti (Compass and The Slater Team collectively referred to herein as "Employer").

153.    That at all times hereinafter alleged, Compass was a general employer of Scivetti as that term is defined by the New York Labor Law.

154.    That at all times hereinafter alleged, Compass was a special employer of Scivetti as that term is defined by New York Labor Law.

155.    That at all times hereinafter alleged, The Slater Team was a general employer of Scivetti as that term is defined by New York Labor Law.

156.    That at all times hereinafter alleged, The Slater Team was a special employer of Scivetti as that term is defined by New York Labor Law.

157.    That at all times hereinafter alleged, Compass employed one (1) or more employees, and as such constituted and constitutes an "employer" within the meaning of § 296, et seq., of the Executive Law of the State of New York and interpreting case precedent (hereinafter "Executive Law").

158.    That at all times hereinafter alleged, The Slater Team employed one (1) or more employees, and as such constituted and constitutes an "employer" within the meaning of Executive Law.

159.    That at all times hereinafter alleged, Scivetti was an "employee", as that term is defined by the Executive Law.

160.    That at all times hereinafter alleged, Berkeley was a "supervisor", as that term is defined by the Executive Law.

161.    That at all times hereinafter alleged, Slater was a "supervisor", as that term is defined by the Executive Law.

162.    That at all times hereinafter alleged, Koeneke was a "supervisor", as that term is defined by the Executive Law.

18

163.    That at all times hereinafter alleged, Walsdorf was a "supervisor", as that term is defined by the Executive Law.

164.    That at all times hereinafter alleged, Berkeley was an "aider and abettor", as that term is defined by the Executive Law.

165.    That at all times hereinafter alleged, Slater was an "aider and abettor", as that term is defined by the Executive Law.

166.    That at all times hereinafter alleged, Koeneke was an "aider and abettor", as that term is defined by the Executive Law.

167.    That at all times hereinafter alleged, Walsdorf was an "aider and abettor", as that term is defined by the Executive Law.

168.    That at all times alleged, Berkeley was and is an individual subject to liability to Scivetti herein, per the Executive Law.

169.    That at all times alleged, Slater was and is an individual subject to liability to Scivetti herein, per the Executive Law.

170.    That at all times alleged, Koeneke was and is an individual subject to liability to Scivetti herein, per the Executive Law.

171.    That at all times alleged, Walsdorf was and is an individual subject to liability to Scivetti herein, per the Executive Law.

172.    That at all times hereinafter alleged, Compass is a "hiring party", as that term is defined the relevant provisions of the Administrative Code, Chapter 10 et seq. (hereinafter "FIFA").

173.    That at all times hereinafter alleged, The Slater Team is an "hiring party", as that term is defined the relevant provisions of the FIFA.

174.    That at all times hereinafter alleged, Scivetti was an "freelance worker", as that term is defined by the FIFA.

175.    That at all times hereinafter alleged, Compass is an "employer", as that term is defined the relevant provisions of the York State Labor Law § 190, et seq. (hereinafter "Labor Law On Commissions").

176.    That at all times hereinafter alleged, The Slater Team is an "employer", as that term is defined the relevant provisions of the Labor Law On Commissions.

177.    That at all times hereinafter alleged, Scivetti was an "employee", as that term is defined by the Labor Law On Commissions.

178.    That at all times hereinafter alleged, Scivetti was a "commissioned salesman", as that term is defined by the Labor Law On Commissions.

179.    That at all times hereinafter alleged, Compass is an "employer", as that term is defined the relevant provisions of the New York State Wage Theft Prevention Act, New York State Labor Law § 215, et seq. (hereinafter "Wage Theft Prevention Act").

180.    That at all times hereinafter alleged, The Slater Team is an "employer", as that term is defined the relevant provisions of the Wage Theft Prevention Act.

181.    That at all times hereinafter alleged, Scivetti was an "employee", as that term is defined by the Wage Theft Prevention Act.

182.    That at all times hereinafter alleged, Berkeley was and is an individual subject to liability to Scivetti herein, per the Wage Theft Prevention Act.

183.    That at all times hereinafter alleged, Slater was and is an individual subject to liability to Scivetti herein, per the Wage Theft Prevention Act.

184.    That at all times hereinafter alleged, Koeneke was and is an individual subject to liability to Scivetti herein, per the Wage Theft Prevention Act.

185.    That at all times hereinafter alleged, Walsdorf was and is an individual subject to liability to Scivetti herein, per the Wage Theft Prevention Act.

186.    That at all times hereinafter alleged, Compass is an "employer", as that term is defined in the relevant provisions of 29 U.S. Code Chapter 18, the Employee Retirement Income Security Program ("ERISA").

187.    That at all times hereinafter alleged, The Slater Team is an "employer", as that term is defined the relevant provisions of ERISA.

188.    That at all times hereinafter alleged, Scivetti was an "employee", as that term is defined the relevant provisions of ERISA.

189.    That at all times hereinafter alleged, Scivetti was and is a female.

190.    That at all times hereinafter alleged, The Slater Team had an office located at 110 Fifth Avenue, Third Floor, New York, New York 10011.

191.    That Slater founded The Slater Team on or about January 2, 2018.

192.    That at all times hereinafter alleged, Koeneke was a licensed real estate agent assigned by Compass, and/or hired by The Slater Team with the knowledge, approval and consent of Compass, to the Slater Team.

193.    That at all times hereinafter alleged, Walsdorf was a licensed real estate agent assigned by Compass, and/or hired by The Slater Team with the knowledge, approval and consent of Compass, to the Slater Team.

194.    That Scivetti was employed jointly and continuously by the Employer from on or about December of 2020-August 25, 2022, in an Administrative Staff position, given the title of the Director of Operations, assigned by Compass, and/or hired by The Slater Team with the knowledge, approval and consent of Compass, to The Slater Team ("Scivetti's Tenure").

195.    That Scivetti's initial compensation from her employment with the Employer included the following ("Scivetti's Employment Terms"):

1.  A base annual salary of $70,000.00, which the Employer not only unilaterally structured as allegedly being paid solely by The Slater Team, but unilaterally classified Scivetti as an employee of The Slater Team, and

2.  1% of The Slater Team's Commission from Compass' Fees received from each of Compass' Real Estate Business transaction closed by The Slater Team; or

3.  2% of The Slater Team's Commission from Compass' Fees received from each of Compass' Real Estate Business transaction closed by The Slater Team, if Scivetti prepared any Board packages as may have been necessary towards the closing by The Slater Team of any such Compass' Real Estate Business transaction;

4.  The Employer not only unilaterally structured the payments to Scivetti of either of the aforesaid percentages allegedly being paid solely by Compass, upon receipt by Compass of the Compass fees from Compass' Real Estate Business transactions (the "Commission Accrual Date"), but the Employer unilaterally classified Scivetti as an independent contractor of Compass; and

5.  Health insurance benefits provided by The Slater Team; and

6.  The right to participate in Compass' stock option plan.

196.     That throughout Scivetti's Tenure, Compass misclassified Scivetti as an independent contractor for Compass.

197.     That throughout Scivetti's Tenure, Scivetti never received any training, employment manuals, policies or procedures with regards to her legal rights and remedies, including but not limited to, sexual harassment training or how to report allegations of employment discrimination, from and/or on behalf of The Slater Team.

198.     That throughout Scivietti's Tenure, The Slater Team did not have either a Human Resources Department, or any designated agent, servant or employee which was communicated to Scivetti, and/or any process/method in which Scivetti could report to The Slater Team, good-faith claims of employment discrimination, sexual harassment, retaliation therefrom, and/or failure to receive timely and proper compensation/employee benefits.

199.     That throughout the entirety of Scivetti's Tenure with the Employer, Scivetti was a non-exempt employee with a position above entry-level.

200.     Notwithstanding the Employer's aforesaid classifications, throughout Scivetti's Tenure, Scivetti was subject to direction, supervision and control by both Compass and The Slater Team, with regards to the terms and conditions, and the duties and responsibilities, of Scivetti's employment, including not only the supervision, direction and control by both Compass and The Slater Team as one of the Compass Departments, as is set forth in hereinabove, but in addition, but not limited to, the following:

    i.     Requiring Scivetti to submit to on-boarding training from Compass, and requiring Scivetti to comply with Compass' Policies And Procedures (Scivetti did not receive separate and distinct on-boarding training, or any policies and procedures regarding her position, from The Slater Team);

    ii.     Setting Scivetti's base work schedule to be from Monday's-Friday's, between 9:30 am-6:00 pm;

    iii.     Requiring Scivetti's daily presence at The Slater Team's assigned office;

    iv.     Requiring Scivetti to use for her position, a Compass-branded computer for all work;

    v.     Requiring Scivetti use a Compass-branded entry pass which allowed access to The Slater Team's assigned office;

vi. Requiring Scivetti to use/display Compass-branded apparel, including but not limited to: water bottles, bags, t-shirts and hats;

vii. Requiring attendance at both Compass' company-wide meetings, and at The Slater Team internal meetings;

viii. Requiring the use of Compass-branded transaction documents and deal packages when working with Compass clients on Compass' Real Estate Business transactions;

ix. Requiring any and all work to be performed through Compass' internal cloud portal;

x. Requiring Scivetti to use a Compass-branded email address for any and all work done on Compass' Real Estate Business transactions;

xi. Holding Scivetti's real estate agent license, and preventing Scivetti from working for any Compass competitor or other similarly-situated business;

xii. Requiring Scivetti to submit all business expenses forms, and Compass' Real Estate Business transactions closed by The Slater Team, through Compass' portal.

201. That Scivetti's duties and responsibilities as the Director of Operations for The Slater Team initially included back-office support for Slater and the Compass Departments Personnel assigned/hired to The Slater Team.

202. That throughout Scivetti's Tenure with Employer, Scivetti's work quality, quantity and performance, was satisfactory or better, if not exemplary.

203. That between on or about December of 2020-August 25, 2022, Scivetti's work performance was regularly and consistently recognized, acknowledged and rewarded by the Employer, its agents, servants and employees, including but not limited to:

i. Scivetti's duties and responsibilities being increased to that of a Team Manager, which included but was not limited to: preparation of marketing reports; assisting the agents of The Slater Team in the scheduling, planning and attendance at open houses; accumulating for filing and entry into Compass' Deal Closer Platform, all additional required documents and information to record Compass' Real Estate Business transactions closed by The Slater Team; creation of The Slater Team central database to store offering plans/condominium and cooperative building legal documents; creation of an internal spreadsheet of Compass' Real

Estate Business pending with The Slater Team, with direct links to the relevant offering plans/condominium and/or cooperative building documents, party information; supervised the duties and responsibilities of a newly-hired marketing assistant assigned/hired to The Slater Team; preparing initial drafts of rental contracts; schedule meetings and outings of/for The Slater Team; assisted with the staging and photographing of apartments; drafted templates of documents for use toward The Slater Team's marketing and closing of Compass Real Estate Business transactions; attendance at closings;

ii.  On or about March 9, 2021, Slater executed a personal guaranty for Scivetti's residential rental apartment, to secure Scivetti's obligations to pay the monthly rent thereof ("Slater's Personal Guaranty");

iii.  On or about June of 2022, Slater tasked Scivetti to help strategize, develop and implement plans for the growth, productivity and restructuring of The Slater Team, as it had not only received a substantial increase in The Slater Team's Commission from the Compass Fees received from Compass' Real Estate Business transactions closed by The Slater Team, but The Slater Team had also received from Compass an increase in its marketing and assistant compensation budgets;

iv.  On or about July 25, 2022, Slater expressly recognized, acknowledged and praised Scivetti's stellar work performance (the "Slater Performance Evaluation"), including Slater affirmatively stating:

A.  That Slater "…value[d] you [Scivetti] highly and consistency…";

B.  That Scivetti not only provided "…hard work", but is a "…very key part of the relationship we have";

C.  That Slater wanted Scivetti to remain employed with the Employer "…for the long term"; and

D.  That Slater was not only "happy to work with you [Scivetti] for a better compensation structure", but Slater offered to help Scivetti form an S-Corporation, claiming it would help alleviate tax liabilities Scivetti would otherwise incur from future Employer compensation.

24

    v.  Concomitant with the Slater Performance Evaluation, and with knowledge, advise, authority, consent and/or ratification of Compass, Slater increased Scivetti's total compensation as follows:

        A.  Scivetti's annual base salary only raised to $80,500.00;

        B.  Scivetti's base percentage of The Slater Team's Commission from Compass' Fees received from each of Compass' Real Estate Business transaction closed by The Slater Team Commissions was increased to 1.5%, which combined with the salary increase, Slater promised, would total at least approximately $155,000.00.

204.    That pursuant to Scivetti Employment Terms, Scivetti's percentage share of The Slater Team's Commissions for Compass Real Estate Business transactions closed by The Slater Team in 2021 for which Scivetti worked on totaled approximately $66,833.72 ("Scivetti's 2021 Earned Percentage").

205.    That notwithstanding Scivetti's 2021 Earned Percentage, the Employer, despite receipt of the Compass Fees, jointly and/or severally, failed to pay either timely or as of the Commissoon Accrual date or otherwise, the sum of $20,789.17 (the "Unpaid Commission").

206.    That Scivetti's Unpaid Commission constituted earned wages, as that term is defined in the New York Labor Law.

207.    That beginning on or about July 2021, Scivetti complained to Walsdorf about her Unpaid Commission.

208.    That concomitant with not being paid the Unpaid Commission, and throughout Scivetti's Tenure, Scivetti was repeatedly the target of a replete, continuous, unwanted, hostile, adverse and pervasive illegal pattern of gender discrimination and/or sexual harassment, by Koeneke (the "Koeneke's Sexual Harassment").

209.    That throughout Scivetti's Tenure, examples of Koeneke's Sexual Harassment included, but are not limited to, the following:

    i.  Referring to Scivetti as either a "love" or a "bitch", depending on Koeneke's mood;

    ii.  Constantly and brazenly commenting on Scivetti's appearance, and that of other the female employees of Employer;

    iii.  Despite knowing that Scivetti's work hours were between on or about 9:30 am-6:00 pm, and despite admitting that it was inappropriate to do so, Koeneke repeatedly texted Scivetti prior to work hours (between on and around 6:00 am-7:00 am) with alleged work assignments, as well as directing Scivetti to perform personal errands for him, notwithstanding Slater advising that such were not to be a part of Scivetti's assigned duties and responsibilities;

    iv.  On or about September 18, 2021, texting Scivetti "I love you" outside of work hours;

    v.  Starting in or about February of 2022, repeatedly making offensive misogynistic and derogatory references and remarks about/towards women in the workplace, including Koeneke's characterization of them as "dramatic", "bitches" or "hot";

    vi.  Starting in or about February of 2022, consistently texting inappropriate, sexist and mysogysnitic texts to The Slater Team WhatsApp group chat;

    vii.  On or about June 22, 2022, willfully embarrassing Scivetti in front of her co-workers with false accusations of Scivetti dating a male client, while discussing company policies and procedures about the financial vetting of clients in advance of showing them available listings;

210.    That through Scivetti's Tenure, Scivetti repeatedly reported and/or complained to the Defendants, its and their agents, servants and employees, and the Compass Departments Personnel assigned/hired to The Slater Team about Koeneke's Sexual Harassment and the Unpaid Commissions.  Examples include, but are not limited to, the following:

    i.  From on or about the middle of 2021-August 2, 2022, Scivetti repeatedly complained of the Unpaid Commission, including but not limited to both Walsdorf and Slater;

    ii.  Between on or about July 12, 2022-July 13, 2022, Scivetti not only complained to and discussed Koeneke's Sexual Harassment with Walsdorf, who as of on or about June 12, 2022 was promoted to a supervisory role at The Slater Team, and to whom Scivetti also reported to for the duration of Scivetti's Tenure, but Scivetti specifically advised Walsdorf that employers have been found liable for substantial penalties, and had to pay substantial settlements, for both sexually harassing and failing to properly pay its employees;

iii. On or about July 27, 2022, Scivetti again reported and/or complained of on-going Koeneke's Sexual Harassment to Walsdorf (the "Walsdorf Complaint"), during which Walsdorf not only admitted to have also reported Koeneke's Sexual Harassment to Slater, but that Koeneke's Sexual Harassment had become a "…serious problem with the women on [The Slater] team", and that Slater had disclosed the terms of Scivetti's Raise to Koeneke;

1. Walsdorf, however, was an active participant, perpetrator and/or aider and abettor in the Employer's pervasive pattern of sexual harassment against Scivetti throughout Scivetti's tenure with Employer, including but not limited to: Walsdorf repeatedly told Scivetti during the course of business hours at The Slater Team's office, not only to Scivetti in private but also in front of both Scivetti and Slater Team employees, agents and/or independent contractors, about the sexual exploits of a friend who Walsdorf followed on Snapchat and/or Instagram in graphic detail (the "Snapchat Sex Stories");

2. That Walsdorf noted to Scivetti, not only to Scivetti in private but also in front of both Scivetti and Slater Team employees, agents and/or independent contractors, that the Snapchat Sex Stories were videotaped, and that Walsdorf would watch same during the course of regular business hours;

iv. On or about August 2, 2022, Scivetti again reported on-going Koeneke's Sexual Harassment (and acts of retaliation for Scivetti's reporting thereof) to Walsdorf (the "Second Walsdorf Complaint"- the "Walsdorf Complaint" and "Second Walsdorf Complaint" collectively referred to as the "Multiple Walsdorf Complaints").

211.  That in response thereto, the Defendants neither undertook a reasonable investigation of Scivetti's ongoing complaints of Koeneke's Sexual Harassment and Unpaid Commissions, nor instituted and implemented any reasonable remediation thereof.

212.  That rather than undertaking a reasonable investigation and instituting/implementing any reasonable remediation of Scivetti's ongoing complaints of Sexual Harassment and Unpaid Commissions throughout Scivetti's Tenure, the Defendants, its and their agents, servants and employees not only summarily dismissed such complaints, but intentionally attempted to dissuade Scivetti from further pursuit of such complaints, warning and threatening Scivetti with adverse treatment with respect to the terms and conditions and the duties and responsibilities of Scivetti's position with the Employer, and engaged in a replete

pattern of unlawfully adverse retaliation against Scivetti for her continued pursuit of such complaints (the "Retaliation"), as Slater believed Koeneke was a high-producing/income generator for The Slater Team, and thus Slater expressly intended to permit Koeneke to continue to engage in such illegal actions, conduct and behavior unabatedly. Examples include, but are not limited to, the following:

i. From on or about the middle of 2021, Walsdorf admonishing Scivetti for complaining about the Unpaid Commission, claiming Scivetti should instead be satisfied with Slater's Personal Guaranty of her residential apartment lease;

ii. On or about July 25, 2022, while Slater acknowledged Scivetti's complaint of Unpaid Commission, Slater's sole response was to feign ignorance and provide an empty promise to "…get back to you [Scivetti] with a plan";

iii. On or about August 2, 2022, Walsdorf not only admonished Scivetti for making any continued complaints of Koeneke's Sexual Harassment and Retaliation, instructing that Scivetti should instead "…seek to appease Koeneke" and to "…get on Koeneke's good side", warning that otherwise Slater would "…ultimately choose Koeneke" over Scivetti. [Walsdorf's warnings proved prescient-Koeneke's compensation was not only increased to well above that of the other agents and/or brokers assigned/hired to The Slater Team, but that beginning on or about August 3, 2022, Slater and Koeneke developed and implemented plans for the future business operations of The Slater Team, which resulted in Slater and Koeneke forming Trove, which became the successor to The Slater Team];

iv. Concomitant herewith, and in response to Scivetti's Sexual Harassment Complaints, Koeneke repeatedly and brazenly disparaged and demeaned Scivetti's work ethic and professionalism to her co-workers (including that Scivetti "…did not do any work", that Scivetti was "useless", and wrongfully accused Scivetti of intentionally failing to input transactions on Koeneke's agent page with the Employer);

v. Scivetti was suddenly stripped of her duties and responsibilities and instead relegated to perform menial tasks for Koeneke;

vi. During a meeting with Slater on or about August 25, 2022, with the advance knowledge, advise, consent, authority, permission and/or retaliation of Berkeley, in his capacity as a Compass Liaison to The Slater Team on behalf of Compass, Scivetti was suddenly terminated, with Slater exclaiming that The Slater Team

had suddenly "…grown too large" for Scivetti (and in response to her query, Slater expressly advised that Scivetti's termination was not based on any poor work performance issues) ("Scivetti's Termination");

vii. The Employer failed to provide Scivetti with either a written termination notice, or a COBRA notice to maintain post-Scivetti Termination health insurance benefits;

viii. As part of Scivetti's Termination, Compass suddenly revoked Scivetti's status as a Compass licensed real estate agent (the "License Drop");

ix. Scivetti repeatedly protested the License Drop, to which the Employer, with the advance knowledge, advise, consent, authority, permission and/or ratification of Berkeley, in his capacity as a Compass Liaison to The Slater Team on behalf of Compass, only partially reinstated Scvietti's status with Compass (as only a referral real estate agent), thereby substantially reducing her ability to earn commissions from pending and future real estate transaction [upon information and belief, when male real estate agents were terminated by the Employer, their status as a fully licensed real estate agent at Compass was not similarly changed, impaired or impacted];

x. On or about September 12, 2022, and in response to Scivetti's continued complaints of Unpaid Commission, Berkeley expressly instructed Slater to obtain a general release of any and all claims and causes of action from Scivetti, as a condition precedent to the payment of the Unpaid Commission (the "Release"), despite the Unpaid Commission being heretofore fully earned and duly owing by the Employer to Scivetti;

xi.  The Release was neither presented to, nor executed by, Scivetti, and only after additional protestation, did the Employer finally but untimely pay the Unpaid Commission.

213.    That after Scivetti's Termination, Compass' agents, servants and employees, including Berkeley, sought applications for open employment positions within various Compass Departments, for which Scivetti was qualified but was not offered, despite both Scivetti applying therefor, and Defendants' acknowledgement that Scivetti was qualified for such open employment positions. Examples include, but are not limited to the following:

i. Beginning on or about October 19, 2022, Compass issued internal emails, including by Berkeley, to Compass' agents, brokers and the

various Compass Departments, seeking candidates to apply for an open employment assistant position, for which Scivetti was qualified;

ii.   Walsdorf notified Scivetti thereof, directing Scivetti to apply, believing Scivetti to be qualified;

iii.  On or about December 21, 2022, Scivetti applied via email for an open assistant position with another of Compass Departments entitled the Hudson Advisory Team (the "December Job Post");

iv.  On or about December 21, 2022, Scivetti received an email response to her application for the December Job Post from Spencer Simon ("Simon", Compass' Hudson Advisory Team's Director Of Operations & Client Relations), with Simon advising that he would contact Scivetti for "next steps".

214.    That notwithstanding open Compass employment positions for which Defendants acknowledged that Scivetti was both qualified and applied for, neither Simon nor any one from Compass ever contacted Scivetti to either discuss the "next steps" for, or to offer, re-employment thereat ("Compass' Further Retaliation").

215.    That Compass refused, and/or intentionally failed to reasonably address, process and consider Scivetti's application for re-employment.

216.    That the Defendants knew about Scivetti's application for re-employment with Compass, intentionally participated and/or aided and abetted in Compass' Further Retaliation.

217.    That a motivating factor of Compass' Further Retaliation constitutes either Retaliation for Scivetti's complaints of either Koeneke's Sexual Harassment and/or Unpaid Commission, and/or a separate act of unlawful employment discrimination in violation of applicable Federal, State and City of New York laws.

218.    That any alleged business justification to the allegations set forth herein, including but not limited to Scivetti being terminated for alleged poor job performance, attendance and/or failure to comply with work directives, was and is a pretext to conceal unlawful employment discrimination, retaliation and failure to pay earned wages/compensation, in violation of applicable law.

219.    That on or about April 19, 2023, in response to an inquiry from a third-party about Scivetti's work history and performance during Scivetti's Tenure at the Employer, Slater expressly admitted that:

    i.    Scivetti's Termination was solely the result of an alleged structural organizational change in The Slater Team;

    ii.   Scivetti's work performance during Scivetti's Tenure at the Employer was not an issue (that Slater did not "…see any weaknesses in [Scivetti's] work performance"); and

    iii.  Based on a scale of 1-10, Slater not only rated Scivetti's work performance as a "7" of "10", but when questioned as to how strong Slater would recommend Scivetti as a candidate to a prospective employer for employment, Slater responded with an "8" of "10".

220.     That on or about June 13, 2023, Scivetti filed with the U.S. Equal Employment Opportunity Commission (the "EEOC"), a complaint of sexual harassment, gender discrimination and retaliation against both Compass and The Slater Team (the "Compass/Slater EEOC Complaint").

221.     That on or about October 5, 2023, during the pendency of the EEOC's investigation of the Compass/Slater EEOC Complaint, Trove was incorporated ("Trove's Incorporation").

222.     That beginning by and around Trove's Incorporation, by and/or on behalf of Trove, a web site was created, platformed and published, wherein it was marketed, with the knowledge, advise, permission, authority, consent and/or ratification of both Slater and Koeneke, that both Slater and Koeneke were the founders of Trove.

223.     That both Slater and Koeneke were and are owners, officers, directors and/or shareholders of Trove.

224.     That from on or about January 2024, during the pendency of the EEOC's investigation of the Compass/Slater EEOC Complaint, Trove began operating and conducting business, and remains operating and conducting business, as another of the Compass Departments, with the same business purpose of conducting and transacting Compass' Real Estate Business, with Trove being subject to the same aforesaid alleged rules, policies and regulations, as the other Compass Departments (hereinafter "Trove Business Operations").

225.     That from on or about Trove's Incorporation, The Slater Team ceased conducting new Compass' Real Estate Business as one of Compass Departments.

226.     That from on or about the commencement of Trove's Business Operations, The Slater Team ceased employing, and/or having assigned thereto, any of Compass Departments Personnel.

227.    That from on or about the commencement of Trove's Business Operations, The Slater Team sold, moved, traded or otherwise transferred all assets of The Slater Team to Trove, including but not limited to, its office, clients, contacts, business operations, real estate sales and rental listings, good-will and the Compass Departments Personnel theretofore hired by/assigned to The Slater Team.

228.    That from on or about the commencement of Trove's Business Operations, Trove absorbed, acquired, attained, purchased and/or assumed all of the Slater Team's assets, including but not limited to, its office, clients, contacts, business operations, real estate sales and rental listings, good-will and the Compass Departments Personnel theretofore hired by/assigned to The Slater Team.

229.    That from on or about the commencement of Trove's Business Operations, Trove assumed, purchased, absorbed and/or acquired all of the liabilities of The Slater Team, including but limited to, the accounts payable, business expenses, overhead, contractual obligations and payroll.

230.    That at all times hereinafter alleged, Trove assumed and continued the general business operations, in the place of, The Slater Team, and replaced in toto The Slater Team as one of the Compass Departments.

231.    That from on or about the commencement of Trove's Business Operations, The Slater Team de facto dissolved its business.

232.    That from on or about the commencement of Trove's Business Operations, as a matter of fact and/or law, Trove was and is the mere continuation of, and the successor to, The Slater Team.

233.    That in the marketing of Trove, including on a social media post on Slater's own Instagram (@IanSlater) dated January 18, 2024, Slater admitted that Trove was "an evolution of [The] Slater Team".

234.    That as a matter of fact and/or law, Trove bears and assumes successor liability to Scivetti, for any and all of the allegations, causes of action and prayers for relief set forth herein, from which The Slater Team would be liable to Scivetti.

235.    That the EEOC issued to Scivetti, a Right to Sue Letter dated February 22, 2024, regarding the Compass/Slater EEOC Complaint, to initiate the subject action.

236.    That on or about March 7, 2024, Scivetti filed a complaint with the EEOC, regarding the aforesaid allegations, as against Trove (the "Trove EEOC Complaint").

237.     That the EEOC issued to Scivetti a Right to Sue Letter dated March 26, 2024, regarding the Trove EEOC Complaint, to initiate the subject action.

238.     That Scivetti has complied with all conditions precedent to the commencement of the subject action.

## FEDERAL STATUTORY CAUSES OF ACTION

## <u>FIRST CAUSE OF ACTION</u>

**(Violations of Title VII of the Civil Rights Act of 1964 on behalf of Plaintiff against Employer and Trove- Sexual Harassment/Discrimination)**

239.     Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"238" of this Complaint as though fully and completely set forth at length herein.

240.     It is a violation of Title VII for employers such as Employer to discriminate in the terms and conditions of employment, because an employee is a member of a statutorily protected class of individuals.

241.     Gender and sexual harassment in the workplace are defined by Title VII as a statutorily protected class.

242.     Employees that have the terms and conditions of their employment changed, and/or adversely affected, as well as being terminated from employment, because of their gender and sex, are defined by Title VII and by case precedent as a protected class.

243.     Scivetti was and is a member of the aforesaid protected class.

244.     The aforesaid alleged adverse conduct, actions and behavior of the Employer, its agents, servants or employees, were based upon Scivetti's membership in the aforesaid protected class, in violation of Title VII.

245.     That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions were and are a pretext for discrimination.

246.     In addition to suffering significant loss of economic damages, bonuses, income, perks and benefits, wages and wage supplements, Scivetti was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, and will continue to so suffer into the future, all because of the Employer's outrageous and reprehensible conduct in violating Scivetti's human rights.

247.    As a proximate result of the Employer's conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries have and will continue to have an irreparably devastating effect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

248.    That the aforesaid actions, conduct and behavior of Employer, its agents, servants and employees, are beyond and what is considered reasonable and acceptable in a civilized society, and shocks the conscience of this Honorable Court, and thus warrants an award of punitive damages.

249.    That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

250.    Scivetti, therefore, seeks monetary damages for this cause of action, in an amount of $5,000,000.00, in addition to the imposition upon the defendants, of a separate award of punitive damages and attorney's fees.

## SECOND CAUSE OF ACTION

### (Violations of Title VII of the Civil Rights Act of 1964 on behalf of Plaintiff against Employer and Trove- Retaliation)

251.    Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"250" of this Complaint as though fully and completely set forth at length herein.

252.    That under Title VII, an employee complaining of discrimination and/or harassment is a protected activity.

253.    That under Title VII, an employer cannot retaliate against an employee by adversely changing the terms and conditions of their employment for complaints of gender and sex discrimination, and/or harassment based on sex.

254.    That it is a violation of Title VII for an employer such as Employer to retaliate against an employee by adversely changing the terms and conditions of their employment for complaints of gender discrimination, and/or harassment based on sex.

255.    During Scivetti's Tenure, Scivetti repeatedly complained of Koeneke's Sexual Harassment, and as such, Scivetti was and is a member of the aforesaid protected class.

256.    That the aforesaid alleged conduct, actions and behavior of Retaliation by the Employer, its agents, servants or employees, were motivated in part or in

whole by Scivetti's repeated complaints of Koenke's Sexual Harassment, in violation of Title VII.

257.    That the aforesaid alleged conduct, activities and behavior of Compass' Further Retaliation by the Employer, its agents, servants or employees, were motivated by Scivetti's repeated complaints of Koenke's Sexual Harassment, in violation of Title VII.

258.    That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions were and are a pretext for retaliation.

259.    In addition to suffering significant loss of economic damages, bonuses, income, perks and benefits, wage and wage supplements, Scivetti was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, and will continue to so suffer into the future, all because of Employer's outrageous and reprehensible conduct in violating Scivetti's human rights.

260.    As a proximate result of the Employer's conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries have and will continue to have an irreparably devastating effect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

261.    That the aforesaid actions, conduct and behavior of Employer, its agents, servants and employees, are beyond and what is considered reasonable and acceptable in a civilized society, and shocks the conscience of this Honorable Court, and thus warrants an award of punitive damages.

262.    That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

263.    Scivetti, therefore, seeks monetary damages for this cause of action, in an amount of $5,000,000.00, in addition to the imposition upon the defendants, of a separate award of punitive damages and attorney's fees.

## THIRD CAUSE OF ACTION

**(Violations of Title VII of the Civil Rights Act of 1964 on behalf of Plaintiff against Employer and Trove-Sexual Harassment/Discrimination)**

264.    Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"265" of this Complaint as though fully and completely set forth at length herein.

265.    It is a violation of Title VII for employers such as Employer to discriminate in the hiring of employees, because a job applicant and/or potential employee is a member of a statutorily protected class of individuals.

266.    Gender and sexual harassment are defined by Title VII as a statutorily protected class.

267.    Scivetti was and is a member of the aforesaid protected class, who responded to the December Job Post for employment with the Employer to a position for which Scivetti was knowingly qualified.

268.    Scivetti was and is a member of the aforesaid protected class, who applied for employment with the Employer.

269.    Compass' Further Retaliation in refusing to respond to Scivetti'ss application for employment and/or offer employment in regards to the December Job Post was motivated by Scivetti's complaints of Koeneke's Sexual Harassment in violation of Title VII.

270.    That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions were and are a pretext for discrimination.

271.    In addition to suffering significant loss of economic damages, bonuses, income, perks and benefits, Wages and Wage Supplements, Scivetti was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, and will continue to so suffer into the future, all because of the Employer's outrageous and reprehensible conduct in violating Scivetti's human rights.

272.    As a proximate result of the Employer's conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries have and will continue to have an irreparably devastating effect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

273.    That the aforesaid actions, conduct and behavior of Employer, its agents, servants and employees, are beyond and what is considered reasonable and acceptable in a civilized society, and shocks the conscience of this Honorable Court, and thus warrants an award of punitive damages.

274.    Scivetti, therefore, seeks monetary damages for this cause of action, in an amount in excess of the jurisdictional limits of all lower Courts, the sum of which to be determined by the trier of fact, in addition to the imposition upon the defendants, of a separate award of punitive damages and attorney's fees.

275.     That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

276.     Scivetti, therefore, seeks monetary damages for this cause of action, in an amount of $5,000,000.00, in addition to the imposition upon the defendants, of a separate award of punitive damages and attorney's fees.

## FOURTH CAUSE OF ACTION

### (Violations of Employee Retirement Income Security Act of 1974 on behalf of Plaintiff against Employer and Trove)

277.     Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"276" of this Complaint as though fully and completely set forth at length herein.

278.     That the Employer has a legal duty to notify its plan administrator of the employee's death, termination of employment, reduction in hours, Medicare eligibility or Title 11 proceedings within 30 days of the qualifying event such that the plan administrator can advise the employee of any options of continued coverage (the "Cobra Notice").

279.     That termination of an employee is considered a "qualifying event" under ERISA.

280.     That Employer provided health benefits to Scivetti as part of the Scivetti's Employment Terms (the "Health Benefits").

281.     That the Health Benefits provided to Scivetti fall within the purview of ERISA.

282.     That it is a violation of ERISA for an employer such as Compass to fail to provide to employees such as Scivetti the requisite Cobra Notice.

283.     That in failing to provide a Cobra Notice, employers can be subject to a penalty of up to $110 per day, as well as the cost of medical expenses incurred by the qualified beneficiary.

284.     That Scivetti was a qualified beneficiary as that term is defined by ERISA.

285.     That Emloyer failed to provide a Cobra Notice to Scivetti upon Scivetti's Termination.

286.     As a proximate result of such unlawful conduct, Scivetti has sustained damages, and is entitled to an award any and all available legal and equitable remedies available under ERISA, including but not limited to, continued health coverage, attorney's fees and restitution.

287.     That the aforesaid actions, conduct and behavior of Employer, its agents, servants and employees, were intentional are beyond and what is considered reasonable and acceptable in a civilized society, and shocks the conscience of this Honorable Court, and thus warrants an award of punitive damages.

288.     That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

289.     Scivetti, therefore, seeks monetary damages for this cause of action, in an amount of $110.00 per day of violation, in addition to the imposition upon the defendants, of a separate award of punitive damages and attorney's fees.

## PENDENT STATE CAUSES OF ACTION ON BEHALF OF PLAINTIFF AGAINST THE DEFENDANTS

## AS AND FOR THE FIFTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS FOR UNLAWFUL DISCRIMINATION IN VIOLATION OF EXECUTIVE LAW SECTION 296(1)(a)

290.     Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"289" of this Complaint as though fully and completely set forth at length herein.

291.     It is a violation of the New York State anti-discrimination laws for employers such as Employer to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

292.     It is a violation of the New York State anti-discrimination laws for a supervisor such as Berkeley to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

293.     It is a violation of the New York State anti-discrimination laws for a supervisor such as Slater to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

294.      It is a violation of the New York State anti-discrimination laws for a supervisor such as Koeneke to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

295.      It is a violation of the New York State anti-discrimination laws for a supervisor such as Walsdorf to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

296.      It is a violation of the Executive Law for an aider and abettor such as Berkeley to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

297.      It is a violation of the Executive Law for an aider and abettor such as Slater to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

298.      It is a violation of the Executive Law for an aider and abettor such as Koeneke to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

299.      It is a violation of the Executive Law for an aider and abettor such as Walsdorf to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

300.      Employees that have the terms and conditions of their employment changed, as well as being terminated from employment, because of their gender are defined by the New York State anti-discrimination statutes and by case precedent as a protected class.

301.      Scivetti was and is a member of the aforesaid protected class as above.

302.      That the Defendants intentionally perpetuated, and allowed to continue, a pattern of replete and pervasive pattern of gender discrimination and sexual harassment against Scivetti.

303.      That the Defendants intentionally discriminated against Scivetti for her membership in the protected class, in that Scivetti was denied bonuses, raises and, ultimately terminated.

304.      The aforesaid conduct, actions and behavior of the Defendants, their agents, servants or employees, were based upon her membership in the aforesaid protected class, in violation of the aforesaid New York State anti-discrimination statutes.

305.     That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions were and are a pretext for discrimination.

306.     In addition to suffering significant economic damages, loss of bonuses, income, perks and benefits, wages and wage supplements, Scivetti was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, and will continue to so suffer into the future, all because of defendants' outrageous and reprehensible conduct in violating Scivetti's human rights.

307.     As a proximate result of Defendants' conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries has and will continue to have an irreparably devastating affect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

308.     That the aforesaid actions, conduct and behavior of the Defendants, their agents, servants and employees, are beyond and what is considered reasonable and acceptable in a civilized society, and shocks the conscience of this Honorable Court.

309.     That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

310.     Scivetti, therefore, seeks monetary damages for this cause of action, in an amount of $5,000,000.00, in addition to the imposition upon the defendants, of a separate award of punitive damages and attorney's fees.

## AS AND FOR A SIXTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS FOR UNLAWFUL RETALIATION IN VIOLATION OF EXECUTIVE LAW SECTION 296, ET SEQ.

311.     Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"310" of this Complaint as though fully and completely set forth at length herein.

312.     It is a violation of the Executive Law for employers such as Employer to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

313.     It is a violation of the Executive Law for a supervisor such as Berkeley to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

314.     It is a violation of the Executive Law for a supervisor such as Slater to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

315.     It is a violation of the Executive Law for a supervisor such as Koeneke to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

316.     It is a violation of the Executive Law for a supervisor such as Walsdorf to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

317.     It is a violation of the Executive Law for an aider and abettor such as Berkeley to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

318.     It is a violation of the Executive Law for an aider and abettor such as Slater to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

319.     It is a violation of the Executive Law for an aider and abettor such as Koeneke to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

320.     It is a violation of the Executive Law for an aider and abettor such as Walsdorf to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

321.     Scivetti was and is a member of the aforesaid protected class as above.

322.     That Scivetti's Multiple Walsdorf Complaints were a protected activity as those terms are defined by the Executive Law.

323.     That the Defendants intentionally perpetuated, and allowed to continue, a pattern of replete and pervasive pattern of against Scivetti because of Scivetti's Multiple Walsdorf Complaints.

324.     That the Defendants intentionally perpetuated, and allowed to continue, a pattern of replete and pervasive pattern of retaliation against Scivetti, despite repeated complaints.

325.     That the Defendants intentionally retaliated against Scivetti for Scivetti's Multiple Walsdorf Complaints, in that Scivetti was denied bonuses, raises and, ultimately terminated.

326.    The aforesaid conduct, actions and behavior of the defendants, its and their agents, servants or employees, were based upon Scivetti's complaints of discrimination, in violation of the aforesaid Executive Law.

327.    That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions were and are a pretext for retaliation.

328.    In addition to suffering significant economic damages, loss of bonuses, income, perks and benefits, wages and wage supplements, Scivetti was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, and will continue to so suffer into the future, all because of defendants' outrageous and reprehensible conduct in violating Scivetti's human rights.

329.    As a proximate result of Defendants' conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries have and will continue to have an irreparably devastating effect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

330.    That the aforesaid actions, conduct and behavior of the Defendants, their agents, servants and employees, are beyond and what is considered reasonable and acceptable in a civilized society, and shocks the conscience of this Honorable Court.

331.    That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

332.    Scivetti, therefore, seeks monetary damages for this cause of action, in an amount of $5,000,000.00, in addition to the imposition upon the defendants, of a separate award of punitive damages and attorney's fees.

### AS AND FOR THE SEVENTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS FOR UNLAWFUL DISCRIMINATION IN VIOLATION OF EXECUTIVE LAW SECTION 296, et seq.

333.    Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"332" of this Complaint as though fully and completely set forth at length herein.

334.    It is a violation of the New York State anti-discrimination laws for employers such as Employer to discriminate in the hiring process and decision-making because an applicant for employment such as Scivetti is a member of a statutorily protected class of individuals.

335.    It is a violation of the New York State anti-discrimination laws for a supervisor such as Berkeley to discriminate in the hiring process and decision-making because an applicant for employment such as Scivetti is a member of a statutorily protected class of individuals.

336.    It is a violation of the New York State anti-discrimination laws for a supervisor such as Slater to discriminate in the hiring process and decision-making because an applicant for employment such as Scivetti is a member of a statutorily protected class of individuals.

337.    It is a violation of the New York State anti-discrimination laws for a supervisor such as Koeneke to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

338.    It is a violation of the New York State anti-discrimination laws for a supervisor such as Walsdorf to discriminate in the hiring process and decision-making because an applicant for employment such as Scivetti is a member of a statutorily protected class of individuals.

339.    It is a violation of the Executive Law for an aider and abettor such as Berkeley to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

340.    It is a violation of the Executive Law for an aider and abettor such as Slater to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

341.    It is a violation of the Executive Law for an aider and abettor such as Koeneke to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

342.    It is a violation of the Executive Law for an aider and abettor such as Walsdorf to retaliate against an employee such as Scivetti for complaints of discrimination in the workplace.

343.    Employees that have their employment application denied, ignored or otherwise refused because of their gender are defined by the New York State anti-discrimination statutes and by case precedent as a protected class.

344.    Scivetti was and is a member of the aforesaid protected classes.

345.    That the Defendants intentionally perpetuated, and allowed to continue, a pattern of replete and pervasive pattern of gender discrimination and sexual harassment against Scivetti.

346.     That the Defendants intentionally discriminated against Scivetti for the Multiple Walsdorf Complaints, in that Scivetti was denied the opportunity to apply for a separate and different position at Employer.

347.     The aforesaid conduct, actions and behavior of the Defendants, their agents, servants or employees, were based upon her membership in the aforesaid protected class, in violation of the aforesaid New York State anti-discrimination statutes.

348.     That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions were and are a pretext for discrimination.

349.     In addition to suffering significant economic damages, loss of bonuses, income, perks and benefits, wages and wage supplements, Scivetti was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, and will continue to so suffer into the future, all because of defendants' outrageous and reprehensible conduct in violating Scivetti's human rights.

350.     As a proximate result of Defendants' conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries has and will continue to have an irreparably devastating affect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

351.     That the aforesaid actions, conduct and behavior of the Defendants, their agents, servants and employees, are beyond and what is considered reasonable and acceptable in a civilized society, and shocks the conscience of this Honorable Court.

352.     That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

353.     Scivetti, therefore, seeks monetary damages for this cause of action, in an amount of $5,000,000.00, in addition to the imposition upon the defendants, of a separate award of punitive damages and attorney's fees.

## AS AND FOR A EIGHTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS FOR UNLAWFUL DISCRIMINATION IN VIOLATION OF CHAPTER I, TITLE 8 OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK

354.     Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"353" of this Complaint as if fully and completely set forth at length herein.

355.     It is a violation of the City of New York anti-discrimination laws for employers such as Employer to discriminate in the terms and conditions of employment because an employee is a member of a statutorily protected class of individuals.

356.     It is a violation of the City of New York anti-discrimination laws for a supervisor such as Berkeley to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

357.     It is a violation of the City of New York anti-discrimination laws for a supervisor such as Slater to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

358.     It is a violation of the City of New York anti-discrimination laws for a supervisor such as Koeneke to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

359.     It is a violation of the City of New York anti-discrimination laws for a supervisor such as Walsdorf to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

360.     It is a violation of the City of New York anti-discrimination laws for an aider and abettor such as Berkeley to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

361.     It is a violation of the City of New York anti-discrimination laws for an aider and abettor such as Slater to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

362.     It is a violation of the City of New York anti-discrimination laws for an aider and abettor such as Koeneke to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

363.     It is a violation of the City of New York anti-discrimination laws for an aider and abettor such as Walsdorf to discriminate in the terms and conditions of employment because an employee such as Scivetti is a member of a statutorily protected class of individuals.

364. Employees that have the terms and conditions of their employment changed, as well as being terminated from employment, because of their gender are defined by the City of New York anti-discrimination statutes and by case precedent as a protected class.

365. Scivetti was and is a member of the aforesaid protected class.

366. That the Defendants intentionally perpetuated, and allowed to continue, a pattern of replete and pervasive pattern of gender discrimination and sexual harassment against Scivetti.

367. That the Defendants intentionally discriminated against Scivetti for her membership in the aforesaid protected class, in that Scivetti was terminated, for her legally protected actions.

368. The aforesaid conduct, actions and behavior of the Defendants, their agents, servants or employees, were based upon her membership in the aforesaid protected class, in violation of the aforesaid City of New York anti-discrimination statutes.

369. That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions were and are a pretext for discrimination.

370. In addition to suffering significant loss of bonuses, income, perks and benefits, wages and wage supplements, Scivetti was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, and will continue to so suffer into the future, all because of Defendants' outrageous and reprehensible conduct in violating Scivetti's human rights.

371. As a proximate result of Defendants' conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries has and will continue to have an irreparably devastating affect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

372. That the aforesaid actions, conduct and behavior of the Defendants, their agents, servants and employees, are beyond and what is considered reasonable and acceptable in a civilized society, and shocks the conscience of this Honorable Court.

373. That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

374.     Scivetti, therefore, seeks monetary damages for this cause of action, in an amount of $5,000,000.00, in addition to the imposition upon the defendants, of a separate award of punitive damages and attorney's fees.

**AS AND FOR A NINTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS FOR UNLAWFUL RETALIATION IN VIOLATION OF CHAPTER I, TITLE 8 et seq OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK**

375.     Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"374" of this Complaint as though fully and completely set forth at length herein.

376.     It is a violation of the Administrative Code for employers such as Employer to retaliate in the terms and conditions of employment, because an employee such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

377.     It is a violation of the Administrative Code for supervisors such as Berkeley to retaliate in the terms and conditions of employment, because an employee such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

378.     It is a violation of the Administrative Code for supervisors such as Slater to retaliate in the terms and conditions of employment, because an employee such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

379.     It is a violation of the Administrative Code for supervisors such as Koeneke to retaliate in the terms and conditions of employment, because an employee such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

380.     It is a violation of the Administrative Code for supervisors such as Walsdorf to retaliate in the terms and conditions of employment, because an employee such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

381.     It is a violation of the Administrative Code for an aider and abettor such as Berkeley to retaliate in the terms and conditions of employment, because an employee such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

382.     It is a violation of the Administrative Code for an aider and abettor such as Slater to retaliate in the terms and conditions of employment, because an employee such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

383.     It is a violation of the Administrative Code for an aider and abettor such as Koeneke to retaliate in the terms and conditions of employment, because an employee such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

384.     It is a violation of the Administrative Code for an aider and abettor such as Walsdorf to retaliate in the terms and conditions of employment, because an employee such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

385.     Employees that have the terms and conditions of their employment changed, as well as being terminated from employment, because of their gender and/or be subject to sexual harassment in the workplace, are defined by the Administrative Code and by case precedent as a protected class.

386.     Scivetti was and is a member of the aforesaid protected class.

387.     That Scivetti's Multiple Walsdorf Complaints were complaints of gender discrimination and sexual harassment.

388.     That the Defendants intentionally retaliated against Scivetti for Scivetti's Multiple Walsdorf Complaints, in that Scivetti was terminated for her legally protected actions.

389.     The aforesaid conduct, actions and behavior of the Defendants, its and their agents, servants or employees, were based upon her membership in the aforesaid protected class, in violation of the aforesaid Administrative Code.

390.     That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions were and are a pretext for retaliation.

391.     It is a violation of the Administrative Code for employers such as Employer to retaliate in hiring, screening and selection process for a potential employee, because an employee, potential employee or applicant for employment such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

392.     It is a violation of the Administrative Code for supervisors such as Berkeley to retaliate in hiring, screening and selection process for a potential employee, because an employee, potential employee or applicant for employment such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

393.     It is a violation of the Administrative Code for supervisors such as Slater to retaliate in hiring, screening and selection process for a potential employee,

because an employee, potential employee or applicant for employment such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

394.    It is a violation of the Administrative Code for supervisors such as Koeneke to retaliate in hiring, screening and selection process for a potential employee, because an employee, potential employee or applicant for employment such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

395.    It is a violation of the Administrative Code for supervisors such as Walsdorf to retaliate in hiring, screening and selection process for a potential employee, because an employee, potential employee or applicant for employment such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

396.    It is a violation of the Administrative Code for an aider and abettor such as Berkeley to retaliate in hiring, screening and selection process for a potential employee, because an employee, potential employee or applicant for employment such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

397.    It is a violation of the Administrative Code for an aider and abettor such as Slater to retaliate in hiring, screening and selection process for a potential employee, because an employee, potential employee or applicant for employment such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

398.    It is a violation of the Administrative Code for an aider and abettor such as Koeneke to retaliate in hiring, screening and selection process for a potential employee, because an employee, potential employee or applicant for employment such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

399.    It is a violation of the Administrative Code for an aider and abettor such as Walsdorf to retaliate in hiring, screening and selection process for a potential employee, because an employee, potential employee or applicant for employment such as Scivetti makes complaints regarding gender discrimination/sexual harassment.

400.    Employees that have the terms and conditions of their employment changed, as well as being denied employment, because of their gender and/or be subject to sexual harassment in the workplace, are defined by the Administrative Code and by case precedent as a protected class.

401.    Scivetti was and is a member of the aforesaid protected class.

402.    That the Defendants intentionally retaliated against Scivetti for Scivetti's Multiple Walsdorf Complaints, in Compass Further Retaliation, in that Scivetti was denied employment for her legally protected actions.

403.    The aforesaid conduct, actions and behavior of the Defendants, its and their agents, servants or employees, were based upon her membership in the aforesaid protected class, in violation of the aforesaid Administrative Code.

404.    That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions were and are a pretext for retaliation.

405.    In addition to suffering significant economic damages, loss of bonuses, income, perks and benefits, wages and wage supplements, Scivetti was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, and will continue to so suffer into the future, all because of defendants' outrageous and reprehensible conduct in violating Scivetti's human rights.

406.    As a proximate result of defendants' conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries have and will continue to have an irreparably devastating effect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

407.    That the aforesaid actions, conduct and behavior of the defendants, their agents, servants and employees, are beyond and what is considered reasonable and acceptable in a civilized society, and shocks the conscience of this Honorable Court.

408.    That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

409.    Scivetti, therefore, seeks monetary damages for this cause of action, in an amount of $5,000,000.00, in addition to the imposition upon the defendants, of a separate award of punitive damages and attorney's fees.

### AS AND FOR A TENTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS FOR UNLAWFUL DISCRIMINATION IN VIOLATION OF CHAPTER I, TITLE 8 OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK

410.    Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"409" of this Complaint as if fully and completely set forth at length herein.

411.    It is a violation of the City of New York anti-discrimination laws for employers such as Employer to discriminate in the hiring and decision-making process regarding an applicant, because an applicant such as Scivetti is a member of a statutorily protected class of individuals.

412.    It is a violation of the City of New York anti-discrimination laws for a supervisor such as Berkeley to discriminate in the hiring and decision-making process regarding an applicant, because an applicant such as Scivetti is a member of a statutorily protected class of individuals.

413.    It is a violation of the City of New York anti-discrimination laws for a supervisor such as Slater to discriminate in the hiring and decision-making process regarding an applicant, because an applicant such as Scivetti is a member of a statutorily protected class of individuals.

414.    It is a violation of the City of New York anti-discrimination laws for a supervisor such as Koeneke to discriminate in the hiring and decision-making process regarding an applicant, because an applicant such as Scivetti is a member of a statutorily protected class of individuals.

415.    It is a violation of the City of New York anti-discrimination laws for a supervisor such as Walsdorf to discriminate in the hiring and decision-making process regarding an applicant, because an applicant such as Scivetti is a member of a statutorily protected class of individuals.

416.    It is a violation of the City of New York anti-discrimination laws for an aider and abettor such as Berkeley to discriminate in the hiring and decision-making process regarding an applicant, because an applicant such as Scivetti is a member of a statutorily protected class of individuals.

417.    It is a violation of the City of New York anti-discrimination laws for an aider and abettor such as Slater to discriminate in the hiring and decision-making process regarding an applicant, because an applicant such as Scivetti is a member of a statutorily protected class of individuals.

418.    It is a violation of the City of New York anti-discrimination laws for an aider and abettor such as Koeneke to discriminate in the hiring and decision-making process regarding an applicant, because an applicant such as Scivetti is a member of a statutorily protected class of individuals.

419.    It is a violation of the City of New York anti-discrimination laws for an aider and abettor such as Walsdorf to discriminate in the hiring and decision-making process regarding an applicant, because an applicant such as Scivetti is a member of a statutorily protected class of individuals.

420.    Employees that have the terms and conditions of their employment changed, as well as being terminated from employment, because of their gender are defined by the City of New York anti-discrimination statutes and by case precedent as a protected class.

421.    Scivetti was and is a member of the aforesaid protected class.

422.    That Scivetti's response to the December Job Post constituted an application for re-employment with Employer.

423.    That the Defendants intentionally perpetuated, and allowed to continue, a pattern of replete and pervasive pattern of retaliation against Scivetti.

424.    That the Defendants intentionally discriminated against Scivetti for Scivetti's Multiple Walsdorf Complaints, and in Compass Further Retaliation in that Scivetti was not considered for re-employment, for her legally protected actions.

425.    The aforesaid conduct, actions and behavior of the Defendants, their agents, servants or employees, were based upon her membership in the aforesaid protected class, in violation of the aforesaid City of New York anti-discrimination statutes.

426.    That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions were and are a pretext for discrimination.

427.    In addition to suffering significant loss of bonuses, income, perks and benefits, wages and wage supplements, Scivetti was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, and will continue to so suffer into the future, all because of Defendants' outrageous and reprehensible conduct in violating Scivetti's human rights.

428.    As a proximate result of Defendants' conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries has and will continue to have an irreparably devastating affect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

429.    That the aforesaid actions, conduct and behavior of the Defendants, their agents, servants and employees, are beyond and what is considered reasonable and acceptable in a civilized society, and shocks the conscience of this Honorable Court.

430. That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

431. Scivetti, therefore, seeks monetary damages for this cause of action, in an amount of $5,000,000.00, in addition to the imposition upon the defendants, of a separate award of punitive damages and attorney's fees.

## AS AND FOR A ELEVENTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST EMPLOYER, TROVE AND SLATER FOR VIOLATION OF § 191, ET SEQ., OF THE LABOR LAW OF THE STATE OF NEW YORK-FAILURE TO TIMELY PAY WAGES AND WAGE/SUPPLEMENTS BENEIFTS

432. Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"431" of this Complaint as though fully and completely set forth at length herein.

433. New York State Labor Law § 190(1) defines "wages" as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis."

434. That at all times alleged herein, Employer was an "employer" as that term is defined in New York State Labor Law § 190, et seq.

435. That at all times alleged herein, Slater was Scivetti's supervisor.

436. That at all times alleged herein, Slater was an individual who owed a legal duty to Scivetti to timely pay wages and wage supplements.

437. That at all times alleged herein, Slater is an individual which the New York State Labor Law contemplates as having individual liability herein for the subject-cause of action.

438. That at all times alleged herein, Scivetti was a "commission salesperson" as that term is defined in New York State Labor Law § 190, et seq.

439. That pursuant to New York State Labor Law § 190(1)(c), "A commission salesperson shall be paid the wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment, but not less frequently than once in each month and not later than the last day of the month following the month in which they are earned; provided, however, that if monthly or more frequent payment of wages, salary, drawing accounts or commissions are substantial, then additional compensation earned, including but not limited to extra or incentive earnings, bonuses and special payments, may be paid less frequently than once in each month, but in no event later than the time provided in the employment agreement or compensation plan.

The employer shall furnish a commission salesperson, upon written request, a statement of earnings paid or due and unpaid. The agreed terms of employment shall be reduced to writing, signed by both the employer and the commission salesperson, kept on file by the employer for a period not less than three years and made available to the commissioner upon request. Such writing shall include a description of how wages, salary, drawing account, commissions and all other monies earned and payable shall be calculated. Where the writing provides for a recoverable draw, the frequency of reconciliation shall be included. Such writing shall also provide details pertinent to payment of wages, salary, drawing account, commissions and all other monies earned and payable in the case of termination of employment by either party. The failure of an employer to produce such written terms of employment, upon request of the commissioner, shall give rise to a presumption that the terms of employment that the commissioned salesperson has presented are the agreed terms of employment."

440. Scivetti's Unpaid Commission was untimely and/or improperly paid as she was not paid her Unpaid Commission as of the Commission Accrual Date, in violation of New York State Labor Law § 190, et seq.

441. The aforesaid conduct, actions and behavior of Slater, his and their agents, servants or employees, were based upon her membership in the aforesaid protected class, in violation of the aforesaid New York State Labor Law statute.

442. That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions of the Employer and Slater are pre-textual.

443. That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

444. Scivetti, therefore, seeks monetary damages for this cause of action, in an amount of $5,000,000.00, in addition to the imposition upon the Employer, Trove and Slater of triple damages, of a separate award of punitive damages and attorney's fees.

### AS AND FOR A TWELTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS, IN VIOLATIONS OF § 215 OF THE LABOR LAW OF THE STATE OF NEW YORK AGAINST ALL DEFENDANTS– WAGE THEFT PREVENTION ACT

445. Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"444 of this Complaint as though fully and completely set forth at length herein.

446.      It is a violation of § 215 of the Labor Law of the State of New York (hereinafter the "New York State Wage Theft Prevention Act"), for an employer, such as Employer, to discharge, penalize, or in any manner discriminate or retaliate against an employee, such as Scivetti, regarding the terms and conditions of the employee's employment, because an employee such as Scivetti complained to Employer, its agents, servants and/or employees, of an alleged violation of a labor law.

447.      It is a violation of the New York State Wage Theft Prevention Act, for an individual such as Berkeley, to discharge, penalize, or in any manner discriminate or retaliate against an employee, such as Scivetti, regarding the terms and conditions of the employee's employment, because an employee such as Scivetti, complained to the defendants, its and their agents, servants and/or employees, of an alleged violation of a labor law.

448.      It is a violation of the New York State Wage Theft Prevention Act, for an individual such as Slater, to discharge, penalize, or in any manner discriminate or retaliate against an employee, such as Scivetti, regarding the terms and conditions of the employee's employment, because an employee such as Scivetti, complained to the defendants, its and their agents, servants and/or employees, of an alleged violation of a labor law.

449.      It is a violation of the New York State Wage Theft Prevention Act, for an individual such as Koeneke, to discharge, penalize, or in any manner discriminate or retaliate against an employee, such as Scivetti, regarding the terms and conditions of the employee's employment, because an employee such as Scivetti, complained to the defendants, its and their agents, servants and/or employees, of an alleged violation of a labor law.

450.      It is a violation of the New York State Wage Theft Prevention Act, for an individual such as Walsdorf, to discharge, penalize, or in any manner discriminate or retaliate against an employee, such as Scivetti, regarding the terms and conditions of the employee's employment, because an employee such as Scivetti, complained to the defendants, its and their agents, servants and/or employees, of an alleged violation of a labor law.

451.      That the failure of an employer such as Employer to timely pay wages to an employee such as Scivetti, constitutes a violation of the Labor Law of the State of New York.

452.      That Scivetti's Unpaid Commission constitutes "wages" as that term is defined by the subject-statute.

453.      That Scivetti repeatedly complained to the Employer and the Individual Tortfeasors of the unpaid Unpaid Commission.

454.    That the Defendants retaliation constitute a violation by the Employer's and Individual Tortfeasors, of the New York State Wage Theft Prevention Act.

455.    That as a result of defendants' aforesaid violation of the New York State Wage Theft Prevention Act, Scivetti was rendered discharged and unemployed, Scivetti sustained, and will continue to sustain into the future, significant loss of income, economic damages, wages and wage supplements and was caused to suffer, stress, humiliation, emotional and psychological damages, physical and mental pain and suffering, and will continue to so suffer into the future.

456.    As a proximate result of Employer's and Individual Tortfeasor's wrongful and illegal conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries have and will continue to have an irreparably devastating effect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

457.    That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

458.    Scivetti, therefore, seeks monetary damages for this cause of action, for the sum to be determined by a trier of fact, including statutory punitive damages of $20,000.00, liquidated double damages, treble damages, attorneys' fees, interest, Court costs and disbursements.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST COMPASS OF THE NYLL- FAILURE TO PROVIDE WAGE STATEMENTS

459.    Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"458" of this Complaint as though fully and completely set forth at length herein.

460.    Pursuant to NYLL § 195(3), employers, such as Employer, are required to furnish employees, such as Scivetti, with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked.

461.    That at all times hereinafter alleged, Compass failed to provide Scivetti timely and consistent statements with her wages.

462.     That at all times alleged herein, and as above, Compass misclassified Scivetti as an independent contractor.

463.     That as a result of Compass' willful misclassification of Scivetti as an independent contractor, any and all wage statements provided to Scivetti were improper as a matter of law.

464.     As such, Compass is in violation of NYLL § 195(3).

465.     As a result of the foregoing, Scivetti is entitled to liquidated damages in an amount up to $5,000.00 plus costs and attorneys fees.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST COMPASS OF THE NYLL- FAILURE TO PROVIDE WAGE STATEMENTS

466.     Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"465" of this Complaint as though fully and completely set forth at length herein.

467.     Pursuant to NYLL § 195(3), employers, such as Employer, are required to furnish employees, such as Scivetti, with a statement with every payment of wages, listing the following:  the dates of work covered by that payment of wages;  name of employee;  name of employer;  address and phone number of employer;  rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other;  gross wages;  deductions;  allowances, if any, claimed as part of the minimum wage;  net wages;  the regular hourly rate or rates of pay;  the overtime rate or rates of pay;  the number of regular hours worked, and the number of overtime hours worked.

468.     That at all times hereinafter alleged, Compass failed to provide Scivetti timely and consistent statements with her wages, including but not limited to the Unpaid Commission.

469.     As such, Compass is in violation of NYLL § 195(3).

470.     As a result of the foregoing, Scivetti is entitled to liquidated damages in an amount up to $5,000.00 plus costs and attorneys fees.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST SLATER TEAM AND TROVE FOR VIOLATION OF THE NYLL- FAILURE TO PROVIDE HIRING NOTICE

471.    Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"470" of this Complaint as though fully and completely set forth at length herein.

472.    Pursuant to NYLL § 195(1), employers, such as Employer, are required to furnish employees, such as Scivetti, at his time of hiring with a notice containing the following information:  the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other;  allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;  the regular pay day designated by the employer in accordance with the NYLL;  the name of the employer;  any "doing business as" names used by the employer;  the physical address of the employer's main office or principal place of business, and a mailing address if different;  the telephone number of the employer;  plus such other information as the commissioner deems material and necessary (a "Hiring Notice").

473.    That Employer furnished Scivetti with an improper Hiring Notice in that Scivetti's Hiring Notice did not include the regular pay day designated by the Slater Team in accordance with the NYLL

474.    As such, Employer is in violation of NYLL § 195(1).

475.    That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

476.    As a result of the foregoing, Scivetti is entitled to liquidated damages in an amount up to $5,000.00 plus costs and attorneys' fees.


## AS AND FOR A SIXTEENTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST EMPLOYER FOR VIOLATION OF THE NYLL- FAILURE TO PROVIDE TERMINATION NOTICE

477.    Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"476" of this Complaint as though fully and completely set forth at length herein.

478.    Pursuant to NYLL § 195(6), employers, such as Employer, are required to furnish employees, such as Scivetti, at her time of termination with a notice containing the following information: in writing, of the exact date of such termination as well as the exact date of cancellation of employee benefits connected with such termination. In no case shall notice of such termination be provided more than five working days after the date of such termination. Failure to notify an employee of cancellation of accident or health insurance subjects an

employer to an additional penalty pursuant to section two hundred seventeen of the NYLL chapter (the "Termination Notice").

479.    That Employer never furnished Scivetti with a Termination Notice.

480.    As such, Employer is in violation of NYLL § 195(6).

481.    That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

482.    As a result of the foregoing, Scivetti is entitled to liquidated damages in an amount up to $5,000.00 plus costs and attorneys' fees.

## AS AND FOR A SEVENTEENTHCAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST COMPASS FOR VIOLATION OF THE ADMINSTRATIVE CODE§ 20-928  - FAILURE TO PROVIDE WRITTEN CONTRACT

483.    Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"482" of this Complaint as though fully and completely set forth at length herein.

484.    Pursuant to FIFA, whenever a hiring party retains the services of a freelance worker and the contract between them has a value of $800 or more, either by itself or when aggregated with all contracts for services between the same hiring party and freelance worker during the immediately preceding 120 days, the contract shall be reduced to writing, which shall include the following: The name and mailing address of both the hiring party and the freelance worker; An itemization of all services to be provided by the freelance worker, the value of the services to be provided pursuant to the contract and the rate and method of compensation; and The date on which the hiring party must pay the contracted compensation or the mechanism by which such date will be determined.

485.    Compass was a "hiring party" as defined by FIFA.

486.    Scivetti was a "freelance worker" as defined by FIFA.

487.    The contract for services between Compass and Scivetti was for a sum in excess of $800.00.

488.    Compass did not reduce the contract between Compass and Scivetti to writing.

489.    In the alternative, Compass improperly and/or inadequately reduced the contract between Employer and Scivetti to writing.

490.     As such, Compass is in violation of FIFA Section 20-928.

491.     As a result of the foregoing, Scivetti is entitled to statutory damages in an amount equal to the value of the contract..

## AS AND FOR A EIGHTEENTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST EMPLOYER AND TROVE FOR VIOLATION OF THE ADMINSTRATIVE CODE§ 20-930  - RETALIATION

492.     Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"491" of this Complaint as though fully and completely set forth at length herein.

493.     Pursuant to FIFA, no hiring party shall threaten, intimidate, discipline, harass, deny a work opportunity to or discriminate against a freelance worker, or take any other action that penalizes a freelance worker for, or is reasonably likely to deter a freelancer worker from, exercising or attempting to exercise any right guaranteed under this chapter, or from obtaining future work opportunity because the freelance worker has done so.

494.     Employer was a "hiring party" as defined by FIFA.

495.     Scivetti was a "freelance worker" as defined by FIFA.

496.     The aforesaid conduct, actions and behavior of Employer, its and their agents, servants or employees, were based upon Scivetti's complaints of unpaid wges as it relates to the Unpaid Commission.

497.     The aforesaid conduct, actions and behavior of Employer, its and their agents, servants or employees, were based upon Scivetti's Retaliation and Further Retaliation.

498.     That any and all alleged reasons, explanations or justifications for the aforesaid conduct, behavior and actions were and are a pretext for retaliation.

499.     As such, Employer is in violation of FIFA Section 20-930.

500.     In addition to suffering significant loss of economic damages, bonuses, income, perks and benefits, Wage and Wage Supplements, Scivetti was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, and will continue to so suffer into the future, all because of Employer's outrageous and reprehensible conduct in violating Scivetti's human rights.

501.     As a proximate result of the Employer's conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries have and will continue to have an irreparably devastating effect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

502.     That the aforesaid actions, conduct and behavior of Employer, its agents, servants and employees, are beyond and what is considered reasonable and acceptable in a civilized society, and shocks the conscience of this Honorable Court.

503.     That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

504.     As a result of the foregoing, Scivetti is entitled to statutory damages in an amount up to equal to the value of the underlying contract for each violation arising under FIFA.

### AS AND FOR AN NINETEENTH CAUSE OF ACTION ON BEHALF OF THE PLAINTIFF AGAINST THE DEFENDANT EMPLOYER- BREACH OF CONTRACT

505.     Plaintiff repeats and realleges each and every allegation contained in paragraph #'s "1"-"504" of this Complaint as though fully and completely set forth at length herein.

506.     That at all times alleged herein, Scivetti and Employer had a written and/or oral contract wherein Scivetti would provide services to Employer in exchange for commissions, as alleged hereinabove (the "Contract").

507.     That at all times alleged herein, Employer was a party to the Contract.

508.     That at all times alleged herein, Scivetti was a party to the Contract.

509.     That at all times alleged herein, Scivetti fully discharged her duties to Employer in accordance with the terms of the Contract.

510.     That at all times alleged herein, despite Scivetti providing services to the Employer in accordance with the Contract, Employer refused to pay Scivetti in accordance with the terms thereof, and specifically with regards to her Unpaid Commission.

511.     That Employer breached the Contract, including but not limited to, Employer failing to timely pay Scivetti's Unpaid Commission.

512.     In addition to suffering significant economic damages, expectancy and/consequential damages, loss of bonuses, income, perks and benefits, Wages and Wage Supplements, Scivetti was caused to suffer physical injuries, stress, humiliation, emotional and psychological damages, mental pain and suffering, and will continue to so suffer into the future, all because of defendants' outrageous and reprehensible conduct in violating Scivetti's human rights.

513.     As a proximate result of Defendants' conduct, Scivetti has been adversely affected in her employment opportunities, her normal life's pursuits, and she believes that these injuries has and will continue to have an irreparably devastating affect upon the quality of her life, and will prevent her from functioning as she did prior to the occurrences complained of herein.

514.     That as a matter of fact and/or law, as above, Trove acquired and/or absorbed the assets and liabilities of The Slater Team, including but not limited to, any liability attributed to The Slater Team for this cause of action.

515.     Scivetti, therefore, seeks monetary damages for this cause of action, for the sum to be determined by a trier of fact, including but not limited to, the value of the Contract, attorneys' fees, interest, Court costs and disbursements.

WHEREFORE, plaintiff DANIEILA SCIVETTI demands monetary judgment against defendants COMPASS, INC., SLATER CONSULTING CORP., TROVE PARTNERS, INC., JULIAN BERKELEY, IAN SLATER, MICHAEL KOENEKE, and BRETT WALSDORF in accordance with the aforesaid causes of action, along with the costs, fees and disbursements of this action.

## DEMAND FOR A JURY TRIAL

Plaintiff by and through her attorneys, ALAN J. BENNETT, PLLC, hereby demands a trial by jury on all issues so triable in this matter.

Dated: New York, New York
      May 16, 2024

                          Yours, etc.,

                          Alan J. Bennett, Esq. (AJB-1635)
                          ALAN J. BENNETT, PLLC
                          Attorneys for Plaintiff
                          DANIELA SCIVETTI
                          369 Lexington Avenue
                          Suite 217
                          New York, New York 10017
                          (212) 696-2116