UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
DANIELA SCIVETTI,

                                   Civil Action No.: 1:24-cv-03868-DEH

                  Plaintiff,

        -against-                             AFFIDAVIT
COMPASS, INC., SLATER CONSULTING CORP.,
TROVE PARTNERS, INC., JULIAN BERKELEY,
IAN SLATER, MICHAEL KOENEKE,
and BRETT WALSDORF

                         Defendants.
------------------------------------------------------------------------x

STATE OF NEW YORK        )
                              ): SS
COUNTY OF NEW YORK      )

      I, BRETT WALSDORF, being duly sworn, residing at 215 East 79th Street Apart 7C, New York New York 10075 hereby the states the following to be true, under the penalties for perjury:

1. I am a defendant in the above-captioned matter.

2. This Affidavit is submitted under the penalties for perjury, and contains full disclosure of all facts and information I possess, whether from my personal knowledge and/or from a review of any and all records in my possession regarding the subject-matter and the underlying claims therein.

3. I am a licensed real estate agent in the State of New York and have been since in or about 2013.

4. To my knowledge, COMPASS, INC. ("Compass") was and still is a corporation and maintains its principal place of business and transacts business within the County of New York.

5. To my knowledge, Compass was and is in the business of providing real estate services, including but not limited to, aiding its clients ("Compass Clients") in the renting, selling and buying of residential real property, within various Counties of the City and State of New York ("Compass' Real Estate Business").

6. To my knowledge, Compass hired, and continues to hire, individuals to assist in, transact and effectuate, Compass' Real Estate Business, including myself. See, infra.

7. To my knowledge, Compass authorized, allowed, permitted and/or ratified, and continues to authorize, allow, permit and ratify, its employees and/or independent contractors, to assist and aid the Compass Clients in the conducting and transacting of the Compass Real Estate Business, to form and organize their own divisions/departments within Compass (hereinafter the "Compass Departments").

8. To my knowledge, in or about 2019 through to December of 2023, SLATER CONSULTING CORP. ("The Slater Team") was one of the Compass Departments.

9. To my knowledge, The Slater Team was a corporation and maintained its principal place of business and transacted business within the County of New York.

10. IAN SLATER (hereinafter "Slater") was and is the sole owner of The Slater Team.

11. I began working for Compass as a real estate agent in or about December of 2018.

12. I was hired by Slater, as a real estate agent, from on or about December of 2018 through to December of 2023 ("My Initial Compass Assignment").

13. To my knowledge, Slater's duties and responsibilities included but were not limited to: managing and directing the employees and/or independent contractors either assigned to or hired by, The Slater Team (hereinafter the "Slater Team Personnel");

reviewing all contracts with Compass Clients of real estate transactions handled by The Slater Team; co-executing contracts of real estate transactions of Compass Clients of real estate transactions handled by The Slater Team; hiring and firing the Slater Team Personnel; promoting Slater Team Personnel, including their continued employment and/or assignment to The Slater Team; supervising, overseeing, directing and controlling the assignments, duties and responsibilities (and the performance of the duties and responsibilities)  of the Slater Team Personnel; providing guidance to the Slater Team Personnel as to the performance of their duties and responsibilities and the processing of the real estate transactions of the clients of Compass being handled by The Slater Team; providing feedback to the Slater Team Personnel on a regular basis regarding their work assignments and tasks; coordinating with Compass as to the compensation to be received by The Slater Team for the processing of the real estate transactions for the clients of Compass being handled by The Slater Team; and, determining and reviewing compensation, including but not limited to, pay rates, salaries, commission structure, bonuses' and promotions for the Slater Team Personnel.

14. Throughout My Initial Compass Assignment, Compass appointed, assigned and/or delegated a Compass agent, employee and/or independent contractor, to coordinate, authorize, approve, oversee, supervise, direct and control, the formation, organization and operation of various Compass Departments, including The Slater Team, as well as with regards to the hiring, retention, terms and conditions, duties and responsibilities, and firing/termination, of the Slater Team Personnel, and the

processing of The Slater Team's real estate transactions for the clients of Compass (hereinafter the "Compass Liaison").

15. Throughout My Initial Compass Assignment, JULIAN BERKELEY ("Berkeley") was the Compass Liaison for The Slater Team.

16. To my knowledge, Berkeley's duties and responsibilities included but were not limited to: managing multiple Compass Departments (including The Slater Team); executing exclusive agreements on behalf of Compass/The Slater Team;  reviewing all contracts between Compass Clients and Compass/The Slater Team; executing contracts on behalf of Compass/The Slater Team; hiring and firing personnel for The Slater Team; providing guidance to employees of The Slater Team as to client issues and/or questions.

17. I do not recall receiving any employment manuals or handbooks from Compass at the commencement of, or at any time throughout, My Initial Compass Assignment.

18. I do not recall receiving any training regarding how to report complaints of workplace discrimination to Compass at the commencement of, or at any time throughout, My Initial Compass Assignment.

19. I do not recall receiving any training regarding how to report complaints of workplace sexual harassment from Compass at the commencement of, or at any time throughout, My Initial Compass Assignment.

20. I do not recall receiving any training regarding how to report complaints of workplace retaliation to Compass at the commencement of, or at any time throughout, My Initial Compass Assignment.

21. I do not recall receiving any training regarding how to report complaints of workplace discrimination made to me to Compass at the commencement of, or at any time throughout, My Initial Compass Assignment.

22. I do not recall receiving any training regarding how to report complaints of workplace retaliation made to me to Compass at the commencement of, or at any time throughout, My Initial Compass Assignment.

23. I did not receive any employment manuals or handbooks from The Slater Team at the commencement of, or at any time throughout, My Initial Compass Assignment.

24. I did not receive any training regarding how to report complaints of workplace discrimination, to The Slater Team at the commencement of, or at any time throughout, My Initial Compass Assignment.

25. I did not receive any training regarding how to report complaints of workplace retaliation to The Slater Team at the commencement of, or at any time throughout, My Initial Compass Assignment.

26. I did not receive any training regarding how to report complaints of workplace sexual harassment from The Slater Team at the commencement of, or at any time throughout, My Initial Compass Assignment.

27. I did not receive any training regarding how to report complaints of workplace discrimination made to me to The Slater Team at the commencement of, or at any time throughout, My Initial Compass Assignment.

28. I did not receive any training regarding how to report complaints of workplace retaliation made to me to The Slater Team at the commencement of, or at any time throughout, My Initial Compass Assignment.

29. I did not receive any training regarding how to report complaints of workplace sexual harassment made to me from The Slater Team at the commencement of, or at any time throughout, My Initial Compass Assignment.

30. I cannot locate any written documentation received regarding my duties and responsibilities from The Slater Team at the commencement of, My Initial Compass Assignment.

31. However, I did not receive any training regarding my duties and responsibilities from The Slater Team at the commencement of, or at any time throughout, My Initial Compass Assignment.

32. Throughout My Initial Compass Assignment, the Slater Team Personnel fluctuated:

    a. At any one time,  approximately ten (10) real estate agents either assigned by Compass, and/or hired with the knowledge, consent and permission of Compass, to The Slater Team (the "Slater Team Agents)**;** and

    b. A Director of Operations, a Director of Marketing and a chauffeur for Slater, including but not limited to: DANIELLA SCIVETI ("Scivetti"), Montana Timpson ("Timpson") and "Kalou" (cannot recall last name)  (the "Slater Team Administrative Staff").

33. Slater, as the owner of The Slater Team, was the head manager and supervisor of the Slater Team Personnel.

34. To my knowledge, throughout My Initial Compass Assignment, Berkeley was the team manager for The Slater Team.

35. Throughout My Initial Compass Assignment, The Slater Team solely serviced Compass Clients regardless of whether being assigned to The Slater Team by

Compass, being brought to The Slater Team by Slater, or any of The Slater Team Personnel, or myself.

36. As a real estate agent during My Initial Compass Assignment, neither I nor to my knowledge any of the Slater Team Personnel (including Slater) could work, contract or otherwise provide real estate services to any other real estate brokerage company or on our own.

37. As a real estate agent during My Initial Compass Assignment, neither I nor to my knowledge any of the Slater Team Personnel (including Slater) could work, contract or otherwise provide real estate services to any clients other than Compass Clients.

38. At the commencement of My Initial Compass Assignment, my duties and responsibilities included the procuring of the sale, purchase and rental of real estate property on behalf of the Compass Clients.

39. Throughout My Initial Compass Assignment, my compensation structure was as follows: I received 50% of the commission earned on every sale, purchase or rental of real estate property on behalf of Compass Clients for which I provided real estate transaction services to on behalf of The Slater Team, with, to my knowledge, The Slater Team and Compass splitting the remaining 50% of the commission (the "Walsdorf Originated Commission"). During the course of my Initial Compass Assignment my commission earned increased to 55% and then subsequently to 60%.

40. Throughout My Initial Compass Assignment, and as above, Slater determined the commission structure split between The Slater Team and myself for the sale,

purchase or rent of real estate property for Compass Clients which Slater sourced or was engaged by directly, for which I provided real estate transaction services (the "Slater Originated Commission"- the Walsdorf Originated Commission and the Slater Originated Commission collectively referred to as "My Commission").

41. Throughout My Initial Compass Assignment, I only received an annual IRS W9 from Compass (with no tax holdings taken therefrom) reflecting My Commission.

42. Throughout My Initial Compass Assignment, I did not receive any compensation for real estate transaction services provided directly from The Slater Team, nor did I receive any tax forms from The Slater Team.

43. Throughout My Initial Compass Assignment, upon the completion of a real estate transaction with Compass Clients, Compass would retain the entire commission therefrom, from which Compass would pay The Slater Team and the applicable Slater Team Personnel their respective shares of the commission.

44. Throughout My Initial Compass Assignment, My Commission was always paid by Compass, drawn from a Compass bank account.

45. Throughout My Initial Compass Assignment, per Compass' regular policies and practices, I received My Commission within ten (10) days after the applicable paperwork was submitted to Compass by the Director of Operations, which generally was submitted by and around the closing of the subject real estate transaction.

46. It is my understanding that all Slater Team Personnel similarly received commissions within (10) business days after the applicable paperwork was submitted to Compass by the Director of Operations.

47. Throughout My Initial Compass Assignment, I always received My Commission within ten (10) business days of the applicable paperwork being submitted.

48. Throughout My Initial Compass Assignment, the contracts with Compass Clients assigned to and/or handled by The Slater Team were on Compass-approved forms (the "Compass Client Contracts").

49. Throughout My Initial Compass Assignment, the Compass Client Contracts assigned to and/or handled by The Slater Team had to be reviewed and approved by Berkeley.

50. Shortly after I began My Initial Compass Assignment, MICHAEL KOENEKE ("hereinafter "Koeneke") began working as a real estate agent for Compass.

51. To my knowledge, Koeneke was similarly either assigned by Compass to The Slater Team, or hired with the knowledge and consent of Compass to The Slater Team, as a real estate agent.

52. To my knowledge, Koeneke's duties and responsibilities for The Slater Team included, but were not limited to: the procuring of the sale, purchase and rental of real estate property on behalf of the Compass Clients.

53. To my knowledge, on or about December of 2020, DANIELA SCIVETTI (hereinafter "Scivetti") was either hired directly by The Slater Team, with the knowledge and consent of Compass, and/or was hired by Compass and similarly assigned to The Slater Team.

54. To my knowledge, Scivetti's job title was the Director of Operations for The Slater Team.

55. To my knowledge, throughout her tenure at The Slater Team, Scivetti was deemed and classified a W2 employee of The Slater Team, and as an independent contractor of Compass.

56. Throughout her tenure at Compass, assigned to The Slater Team, in addition to assisting Slater with the administrative office tasks in running The Slater Team, Scivetti was responsible for , assisting, taking direction and control from The Slater Team Agents (including both Koeneke and myself) for the processing of their real estate transactions,  including but not limited to:  aiding Koeneke, myself and the other with their real estate transactions (including but not limited to: operational paperwork, processing commission payments, scheduling open houses and showings, coordinating/preparing/reviewing/filing co-operative and condominium board packages, overseeing/coordinating the staging of real properties for sale or rent, overseeing/coordinating the photography of real properties for sale or rent, and appearing and working at showings for real properties for sale or rent ["Scivetti's Duties and Responsibilities"]).

57. Scivetti's Duties and Responsibilities were subject to review, supervision and approval by myself, Koeneke, Slater and the other Slater Team Agents depending on which agent had assigned her the relevant tasks.

58. To my knowledge, Scivetti's compensation during her tenure at The Slater Team consisted of a base salary, payable by The Slater Team, and a percentage of commissions received from real estate transactions closed by The Slater Team, which was payable to her by Compass.

59. In or about the summer of 2021, and again following her termination in the Summer of 2022 , Scivetti complained to me that she did not believe that she had been paid her share of commission from real estate transactions closed by The Slater Team, despite Compass receiving its share of the commission therefrom ("Scivetti's Unpaid Wage Complaint").

60. Throughout My Initial Compass Assignment, my duties and responsibilities generally increased and I became the "go to" person in the office for younger Slater Team Agents to discuss problems and issues with related to the sale and rent of real estate.

61. In or about the summer of 2022, my role within the Slater Team expanded on an informal basis, and my job duties expanded to include:

    a.  From or about the beginning of the summer of 2022, I started assisting with the day-to-day work of the Slater Team Personnel when requested, including the addressing any issues The Slater Team Administrative Staff had with regards to the business operations of The Slater Team, the performance of their work assignments for The Slater Team Agents, and addressing any complaints or issues between Slater Team Personnel;

    b.  From on or about the beginning of the summer of 2022, I assisted the Slater Team Personnel on how to source, process and close real estate transactions when my assistance was requested;

    c.  From on or about the  of the summer of 2022, I assisted the Slater Team Personnel on Compass' contracts, documentation and general practices when my assistance was requested;

    d.   From on or about the beginning of the summer of 2022, I assisted the Slater Team Personnel on contracts and documentation related to the sale or rental of real estate;

    e.   From on or about the beginning of the summer of 2022, I started providing constructive feedback to junior Slater Team Agents when requested.

62. My increased duties and responsibilities were formally codified by Slater, at my request, on or about June 12, 2022, with Slater giving me the title of Senior Agent (my "Supervisory Role Commencement").

63. Throughout My Initial Compass Assignment, the Slater Team Agents, including Koeneke and myself, exercised supervision, direction and control of Scivetti's Duties and Responsibilities related to the tasks that each individual Slater Team Agent assigned to Scivetti.

64. Throughout my time working with Scivetti, I  found her work performance to be satisfactory.  I liked the stability that Scivetti provided to The Slater Team,  and I personally felt it was important to not have a "revolving door" of operations staff members. Scivetti was also a personal friend, and I wanted to "look out for her."

65. Throughout My Initial Compass Assignment, the Slater Team Personnel, including Scivetti, complained about, Koeneke's behavior toward her in the workplace ("Koeneke' Behavior").

66. Examples of Koeneke's Behavior throughout My Initial Compass Assignment, includes, but are not limited to:

    a.   Scivetti commenting to me that Koeneke had referred to her as a "love", depending on if he appreciated the work she did for him ( to my knowledge,

Koeneke did not have any such nicknames for the men working at Compass and/or The Slater Team);

b.  If Koeneke disagreed with or did not like the work completed for him by Scivetti , Koeneke referred to her in some instances,  as a "bitch" (Koeneke did not have any such nicknames for the men working at Compass or The Slater Team);

c.  In or about June of 2022, Scivetti stated that Koeneke intimated that Scivetti was dating a Compass Client;[1]

d.  On or about July 6, 2022, Timpson commented in a group text message chat between Timpson, Scivetti, Carlin Smith ("Smith") and myself that Koeneke had commented on her appearance, calling her a "bum".[2]

67. Throughout Scivetti's tenure with Compass, assigned to The Slater Team, Scivetti repeatedly complained to myself,  Timpson,  Smith,  Eduardo Martinez, Timothy Ehrlich, and Carlie Levitt, of Koeneke's Behavior,  including but not limited to:

a.  On or about June 15, 2022, Scivetti via text message complained to me and Smith that Koeneke suggested not do any financial background checks for potential clients of Compass/The Slater Team, and they should instead treat Compass Clients like the men who Scivetti dates (that is, to not conduct a background check).[3]

b.  On or about the June of 2022, Scivetti stated in a group text that Koeneke accused her of having dated former clients;

[1] Annexed hereto as Exhibit "1" is a copy of the true and accurate screenshot of the text message.
[2] Annexed hereto as Exhibit "2" is a copy of the true and accurate screenshot of the text message maintained by me.
[3] Annexed hereto as Exhibit "1" is a copy of the true and accurate screenshot of the text message.

    c. On or about the July 13, 2022, Scivetti sent a group Instagram message to myself, Timpson and Smith regarding a sexual harassment settlement of another New York City business (the "Scivetti's Instagram Complaint").[4]

    d. In fact, during on or about the summer of 2022, Scivetti consistently complained to me about Koeneke's Behavior;

68. Given the foregoing, in or about the summer of 2022, I had a conversation with Slater about how the aforesaid workplace relationship between Koeneke and the Slater Team Personnel (including Scivetti) was becoming problematic, including that many of the Slater Team Agents and Slater Team Staff believed that Koeneke was acting like a "jerk", and that Koeneke did not get along with Scivetti (the "Koeneke Conversation").

69. To my knowledge Slater neither provided a response, nor, to the best of my knowledge, sought to initiate any investigation into, the Koeneke Conversation.

70. To my knowledge no investigation was commenced into, nor was anything done to alleviate, Koeneke's Behavior.

71. At the time of complaints of Koeneke's Behavior, I was unaware if either Compass or The Slater Team had a human resources department, or any procedure through which to forward such complaints of Koeneke's Behavior, for its investigation and remediation.

72. As such, in response to Scivetti's complaints of Koeneke's Behavior, I advised her to try and work out the issues directly with Koeneke, because it was in her best interests for continued employment, as Koeneke was a top producer on the Slater

---

[4] Annexed hereto as Exhibit "3" is a copy of the true and accurate screenshot of the text message maintained by me.

Team.  I advised her to try "to be professional with him" rather than continuing to complain.

73. Slater told me on or about August 24, 2022 that he was terminating Scivetti, despite to my knowledge, Scivetti receiving a raise in or about July of 2022.  To my knowledge Scivetti was terminated on August 25, 2022 ("Scivetti's Termination").

74. I thereafter, continued to communicate with Scivetti following Scivetti's Termination.

75. I encouraged Scivetti to apply for other real estate positions with Compass for other Compass Departments, including on or about October 19, 2022, forwarding Scivetti an ad for an open Director of Operations position at another Compass Department, and encouraged her to apply.

76. To my knowledge, in or about the fall of 2023, Slater and Koeneke formed a new Compass Department, known as TROVE PARTNERS, INC. ("Trove"), which began conducting business on or about January of 2024.

77. To my knowledge, Slater and Koeneke co-own Trove.

78. Simultaneous therewith, Slater shut down the business operations of The Slater Team, including but not limited to, any and all sales, purchases and/or rental transactions of real estate on behalf of its and/or Compass' Clients.

79. By and around the time as Trove's incorporation, I was informed by Slater and Koeneke that all Compass Clients being serviced by The Slater Team and the remaining Slater Team Personnel, were being re-assigned to Trove, and to continue with the sales, purchases and/or rental transactions of residential real estate.

80. To my knowledge, Trove assumed the offices, supplies, business expenses, clients and transactions of The Slater Team.

81. The Trove office is located in the same location, floor and space as The Slater Team office.

82. To my knowledge Trove replaced The Slater Team as a Compass Department.

83. Unlike my tenure with The Slater Team, upon joining Trove, I not only received a written employee handbook, setting forth the various employment policies in effect for Trove and Compass (the "Trove Handbook"), but I also received training on the procedure of reporting, investigation and remediation of sexual harassment complaints from Compass and/or Trove, which is as follows: Any sexual harassment should be reported to Slater or a manager, either verbally or in writing such a form or via e-mail, for its investigation and remediation.

84. As of the date of this Affidavit, I remain assigned to Trove, as a senior agent but I

am no longer working in a supervisory capacity.

Dated: New York, New York
       September 4ᵗʰ 2024

_____
BRETT WALSDORF

Sworn and subscribed before me
this 4ᵗʰ day of September, 2024

_____
NOTARY PUBLIC

State of New York · Department of State
Notary Public
Reg. No.: 02ZI6142844
Jay B. Zimner
Valid from 03/27/22 — 03/27/2026

Exhibit "1"



Exhibit "2"



Exhibit "3"

**Brett Walsdorf**

brettwalsdorf liked a message

Jul 13, 2022, 9:58 AM

**daniscii**

You sent an attachment.

Today, we're announcing a major settlement with Sweet & Vicious, a bar in NYC, for sexually harassing its employees, grossly discriminating against them, and stealing their wages.    Current and former employees receive $500,000 from the bar and its owner for this horrible treatment. For years, the owner, Hakan Karamahmutoglu, created and perpetuated this hostile workplace.    He routinely insulted female employees scrutinized their appearance, commenting on their bodies, clothes, and insisted on only hiring employees w were "tall, blonde, and sexy." The owner also routinely made racist and anti-gay comments to employees, di pay overtime, and stole their tips. Male managers groped and harassed female bartenders, and when emplc reported this behavior, it was ignored or laughed at. Because of these brave workers speaking up, these ho: conditions have come to an end. My office will be monitoring Sweet & Vicious to ensure it treats its employe with the respect they deserve. We will continue to protect workers from abusive workplaces.